

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,081

**GUSTAVO TIJERINA SANDOVAL, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON DIRECT APPEAL
## FROM CAUSE NO. 2015-DCR-02443-C IN THE 197ᵀᴴ DISTRICT COURT
## CAMERON COUNTY

KELLER, P.J., delivered the opinion of the Court in which RICHARDSON, YEARY, KEEL, and SLAUGHTER, JJ., joined. HERVEY, NEWELL, WALKER, and MCCLURE, JJ., concurred.

### OPINION

Appellant was charged with the capital murder of Javier Vega, Jr. ("Harvey"),[1] by

intentionally causing his death in the course of committing or attempting to commit the offense of

---

[1] The victim was referred to by witnesses as "Harvey" at trial. The victim's father, Javier Vega, Sr., was referred to as "Javier" at trial. We will employ these designations.

robbery.[2]  A jury found Appellant guilty of capital murder and answered the special issues in such a manner that appellant was sentenced to death.[3]  Appeal to this court is automatic.[4]  Appellant raises twenty-seven points of error.  Finding no reversible error, we affirm the trial court's judgment and sentence.

## I. BACKGROUND

On Sunday, August 3, 2014, Harvey Vega, a border patrol agent, and his family and one of his son's friends went to Harvey's parents' house for a barbeque.  Afterwards, Harvey and some of the others left to go target shooting.  Later, they all decided to meet up again to go fishing.  Harvey's parents drove their own truck.  Harvey's father, Javier, always carried his gun for protection when he went somewhere, so along with their fishing gear, he brought his .40 caliber Sig Sauer, a .22 pistol, and a .22 rifle.

As the two vehicles traveled to the fishing spot, they passed a red SUV parked on the side of the road with two men inside.  Harvey's mother noticed that the SUV was parked on an upslope.  That was unusual to her because, "No one ever parks on the upslope."  Harvey's father got a good look at the two men, and his mother made eye contact with them.  Both parents waved at the two men as they passed.  The SUV started following them.  After the Vega family arrived at and set up

---

[2]  *See* TEX. PENAL CODE § 19.03(a)(2) ("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery.").

[3]  *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b), (e).  All references to articles are to the Code of Criminal Procedure unless otherwise indicated.

[4]  *Id.* § 2(h).  Appellant was also charged with the attempted capital murder of Javier Vega, Sr., and tried for that offense in the same proceeding as the capital murder.  He was sentenced to life on the attempt offense.  Because that sentence is not a death sentence, the attempt offense is not the subject of this appeal.

the fishing site, the SUV drove to within 30 yards but then reversed and drove away.

Ten or fifteen minutes later, the SUV returned. Two men jumped out and began firing their guns at the Vega family. The driver shot Harvey point blank and the passenger shot at the parents. According to the parents, the driver shouted "Al suelo, cabron," meaning "Down to the ground, motherfucker."[5] After Appellant shot Harvey, the passenger shot Javier. Javier fell to the ground, went for his gun, and shot at the passenger. When that happened, the two men got back into the SUV and drove away, with the passenger hanging on to the door. Harvey's parents identified Appellant as the driver and testified that Appellant shot Harvey. The friend, Aric Garcia, testified that the driver shot Harvey. Harvey's wife testified that Appellant was one of the men in the SUV. Harvey died, never regaining consciousness.

Around 2:00 the next morning, the SUV broke down and Appellant and his passenger were forced to walk. They went to a house and asked for help. The woman who lived there let them in, but she alerted border patrol agents after seeing a helicopter search light.

Appellant and his passenger were arrested. Swabs from testing Appellant's hands tested positive for gunshot residue. A .45 caliber Taurus pistol was later found near the scene of Appellant's arrest. Four .45 caliber cartridge casings found at the crime scene and the bullet that killed Harvey were consistent with having been fired from the Taurus. Bloodstains on the driver's

---

[5] Harvey's parents and one of Harvey's sons testified that the two men jumped out and started shooting. Javier testified that the two men began shooting before uttering the command to get on the ground. The son testified that one of the men started yelling and then shot the victim. This son testified that Harvey did not pick up the nearby AR-15 but did draw his service weapon. Another of Harvey's sons testified that the two men started yelling, the family responded, "Don't. No," and the men started shooting. The friend, Aric Garcia, testified that the men yelled something, the Vega family yelled back, the driver shot Harvey, the driver then shot at Harvey's father, and Harvey's father then returned fire. Aric further testified that Appellant and Harvey's father probably exchanged two or three rounds.

side seatbelt and the passenger seat backrest of the red SUV matched Appellant's DNA.[6]

At the punishment stage of trial, the State introduced evidence that Appellant participated in three other robberies against people fishing in the area. During these robberies, the victims were ordered at gunpoint to get on the ground. One victim was struck twice in the head with the butt of a gun. Appellant also had convictions for misdemeanor assault, unlawful carrying of a weapon, and driving while intoxicated, as well as two convictions for possession of marijuana. And Appellant had a federal conviction for illegal reentry after deportation.

Appellant presented the following mitigating evidence at punishment: The woman who lived in the house where Appellant was arrested testified that Appellant did not mistreat, harm, or act disrespectfully to her or her four children while he was there and that she did not feel threatened by him. The evidence also showed that Appellant surrendered peacefully to border patrol agents when they found him. And a director from the Texas Department of Criminal Justice testified that she saw nothing in Appellant's records that indicated he was part of a security threat group, though she testified on cross-examination that he had previously been placed in administrative segregation.

## II. GUILT

### A. Venue

In point of error fourteen, Appellant complains that the trial court erred in refusing to grant a change of venue due to prejudicial publicity. When a defendant seeks a change of venue based on publicity about the case, he must show that the publicity was "pervasive, prejudicial, and

---

[6] According to DNA analyst testimony, it was more than 200 quadrillion times more likely that the DNA on these items came from Appellant than from an unrelated, unknown individual.

inflammatory."[7]  Widespread publicity is not by itself inherently prejudicial.[8]  The defendant must show an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come.[9]  We review a trial court's ruling on a motion to change venue for abuse of discretion and will uphold the trial court's decision if it is within the zone of reasonable disagreement.[10]  The two primary methods of determining whether publicity is pervasive are a hearing on the motion to change venue and the testimony of prospective jurors at voir dire.[11]

Appellant was indicted in Willacy County, where Harvey was killed.  Appellant initially sought and obtained an order restricting publicity.  He later moved to change venue on the basis of prejudicial pretrial publicity, requesting that venue be changed to a county outside the Rio Grande Valley, towards Laredo, Nueces, or San Antonio.  Defense counsel conducted an informal poll of prospective jurors in Willacy and Cameron counties.  In Willacy County, 20 out of 69 respondents (29%) had not formed an opinion as to Appellant's guilt.  In Cameron County, 87 out of 130 respondents (67%) had not formed an opinion as to Appellant's guilt.  The trial court changed venue to Cameron County on the basis of the evidence and because Cameron County had adequate facilities for a capital murder prosecution while Willacy County did not.

Nevertheless, Appellant later moved to change venue again.  In support, he introduced testimony from two local criminal defense attorneys who thought Appellant could not get a fair trial

---

[7] *Tracy v. State*, 597 S.W.3d 502, 509 (Tex. Crim. App. 2020).

[8] *Id.*

[9] *Id.*

[10] *Id.* at 509-10.

[11] *Id.* at 510.

in Cameron County. On cross-examination, one of these attorneys said that he was not surprised by poll results showing over 60% of respondents in Cameron County not having formed an opinion as to guilt.[12] The State introduced the testimony of two people—an administrative director of nursing and the owner of a home health care company—who said that they believed Appellant could get a fair trial in Cameron County. The trial court denied the motion.

Appellant points to the fact that, after an initial panel of 337 prospective jurors, the trial court called two supplemental panels, one of 115 and one of 113. Appellant further contends that nine of the people who actually served on the jury specifically recalled hearing about the case from local news sources around the time the crime occurred. The State responds that none of the twelve jurors indicated significant prior knowledge of the case and that all twelve said that they could render a verdict based solely on the evidence heard in court.

After reviewing Appellant's nine record citations, we find that most involved jurors who had heard little if anything about the case. And as the State points out, all of the jurors said that they could base their decisions about the case solely on the evidence offered at trial.

We conclude that the trial court was within its discretion to decide that Appellant could get a fair trial in Cameron County. Point of error fourteen is overruled.

## B. Jury Selection

### 1. Outside Appellant's Presence

In points of error eleven and twelve, Appellant complains that the trial court erred in hearing qualifications, excuses, and exemptions for three venire panels outside the presence of Appellant and his attorney. He claims that the trial court's conduct violated both constitution and statute.

---

[12] That attorney served as a legal analyst for a news station.

Prospective jurors can be summoned for jury service in general and sent to a central jury room, to be sorted into panels later, or they can be summoned to a "special venire," one that is already assigned to a particular case.[13] Appellant's jury was selected from three special venires called on three different days. The court reporter's record indicates that Appellant and his attorney were not present when the trial court conducted a general inquiry into the prospective jurors' qualifications, excuses, and exemptions but arrived afterwards. We initially perceived a possible conflict in the record because the docket sheets seemed to suggest that Appellant and his attorney were present on these occasions. And in a hearing on Appellant's motion for mistrial, the trial court suggested that Appellant and his attorney were present:

> Okay. Hold on. What I told you was, we had to qualify them just to make . . . certain that, you know, they were—they were a U.S. citizen and a citizen of Texas, presiding in . . . Just pre-qualifications. And I told you you didn't need to be there. *In fact, you were there, though.*[14]

Pursuant to our authority to have an inaccuracy in the record corrected,[15] we remanded the case to the trial court to determine if there was an inaccuracy in either the clerk's record or the reporter's record.[16] On remand, the trial court concluded that neither record was inaccurate. Rather, the clerk's record simply denoted the date and general time period for when Appellant and counsel were present but did not pinpoint specific times they were present. The trial court found that Appellant's attorney observed—but did not participate in—a portion of the first qualifications,

---

[13] *See* Arts. 33.09, 34.01; *Jasper v. State*, 61 S.W.3d 413, 422-23 (Tex. Crim. App. 2001).

[14] Emphasis added.

[15] *See* TEX. R. APP. P. 34.5(d), 34.6(e).

[16] *Sandoval v. State*, No. AP-77,081, 2022 WL 610991 (Tex. Crim. App. March 2, 2022) (not designated for publication).

excuses, and exemptions proceeding. The trial court also found that the court's questioning of prospective jurors at this time was *sotto voce*, at a whisper, and that Appellant's attorney could not hear what was being said. The trial court further found the court reporter's record to "be the most reliable source for what occurred" and that Appellant, his attorney, and the interpreter were not present during the second and third hearings on qualifications, excuses, and exemptions. The trial court also found that all three hearings were held off the record.

Although the right to be present at trial is rooted to a large extent in the right to confrontation, when the defendant is not confronting witnesses or evidence, the right to presence is rooted in due process.[17] A defendant has a due process right to be present "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge."[18] Under Article 33.03, a defendant in a felony case must be personally present at the trial and, in fact, can voluntarily absent himself only after the jury has been selected.[19] The question here is whether the hearings on general qualifications, excuses, and exemptions were part of his "trial" or otherwise had a reasonably substantial relation to his opportunity to defend himself.

Article 35.03 provides:

[T]he court shall then hear and determine excuses offered for not serving as a juror, including any claim of an exemption or a lack of qualification, and if the court considers the excuse sufficient, the court shall discharge the prospective juror or postpone the prospective juror's service to a date specified by the court, as appropriate.[20]

---

[17] *United States v. Gagnon*, 470 U.S. 522, 526 (1985).

[18] *Id.*

[19] Art. 33.03.

[20] Art. 35.03, § 1.

And Article 35.04 provides:

> Any person summoned as a juror who is exempt by law from jury service may establish his exemption without appearing in person by filing a signed statement of the ground of his exemption with the clerk of the court at any time before the date upon which he is summoned to appear.

The fact that an exemption can be claimed in advance indicates that the defendant and his attorney need not be present for the granting of an exemption. Even for mere "excuses," the possible remedy of postponing a prospective juror's service suggests that excuses are meant to be heard before the prospective juror is assigned to a particular case, and consequently, before a defendant's or his attorney's presence would be expected.

In *Jasper v. State*, we explained that the hearing of general qualifications, excuses, and exemptions ordinarily occurs before a prospective juror is assigned to a panel:

> Generally, when prospective jurors are initially summoned, they are assembled in a general jury pool or general assembly. Members of the general assembly are qualified on their ability to serve and exemptions and excuses are heard and ruled on by the judge presiding over the general assembly. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. At that point, attorney voir dire will result in the jury that will ultimately hear the case.[21]

We further explained that this "general assembly" portion of jury selection "is not considered part of 'the trial' and therefore the accused is not entitled to be present."[22] We have reiterated that a defendant does not have a constitutional right to be present or have counsel present during a general assembly in which exemptions are determined.[23]

---

[21] 61 S.W.3d at 422-23.

[22] *Id.* at 423.

[23] *Wells v. State*, 611 S.W.3d 396, 430 (Tex. Crim. App. 2020).

We noted in *Jasper* that the judge in that case was apparently presiding over a jury panel assigned to that case.[24] We "assume[d] that appellant's trial had begun at the time of the exemptions, excuses and qualifications," for the purposes of addressing his point of error, but concluded that the defendant's absence from the proceeding was harmless beyond a reasonable doubt.[25]

Appellant relies on *Jasper* for the proposition that a trial court errs to hold a general qualifications, excuses, and exemptions proceeding outside the defendant's presence when the venire is a special venire. Based on that case, the State concedes that the trial court erred. We disagree. *Jasper* did not hold that a defendant's presence is required if the trial court hears general qualifications, excuses, and exemptions for a panel assigned to the defendant's case. *Jasper* assumed it for the sake of argument, and then found the assumed error to be harmless.

In *Crutsinger v. State*, this Court indicated that the defendant need not be present for excuses unless the excuse is an economic one— even in a capital case.[26] In so concluding, *Crutsinger* cited *Black v. State*.[27] In *Black*, outside the presence of the defendant and the attorneys for both sides, the trial court excused a prospective juror because she was hard of hearing.[28] We held that the trial court

---

[24] 61 S.W.3d at 423.

[25] *Id.* at 423-24.

[26] 206 S.W.3d 607, 608-09 (Tex. Crim. App. 2006). *See* TEX. GOV'T CODE § 62.110(c) ("The court or the court's designee as provided by this section may not excuse a prospective juror for an economic reason unless each party of record is present and approves the release of the juror for that reason.").

[27] *Crutsinger*, *supra.* at 608 (citing *Black v. State*, 26 S.W.3d 895, 899 (Tex. Crim. App. 2000)).

[28] 26 S.W.3d at 899. This excusal was also done "off the record," though the record did show the reason for the excusal. *Id.*

did not abuse its discretion in doing so.[29] *Crutsinger* and *Black* appear to be cases in which the prospective juror was excused from a panel assigned to the defendant's case.[30]

In any event, the reasons we have given for permitting a judge to conduct this type of proceeding outside the presence of the defendant and his attorney apply with equal force to special venires. We have explained that the "process of hearing and granting juror exemptions and excuses of this type lack the traditional adversarial elements of most voir-dire proceedings."[31] Further, the "right to be excused from the venire belongs to each of its individual members, not to the defendant."[32] And it seems nonsensical to suggest that a perfectly permissible procedure becomes a constitutional violation based on how or where the prospective juror is first summoned. Whether the prospective juror is assigned first to the central jury room or to a special venire, a preliminary inquiry into his general qualifications, excuses, and exemptions is not the sort of proceeding that needs to be conducted in the defendant's presence. And nothing in the statute authorizing a special venire for a capital case requires that an Article 35.03 proceeding be held in the presence of the defendant.[33] Points of error eleven and twelve are overruled.

### 2. Lack of Record

In point of error thirteen, Appellant contends that the failure to record the proceedings on qualifications, excuses, and exemptions requires a new trial. He relies on the appellate rule regarding

---

[29] *Id.* at 900.

[30] *See supra* at nn. 26-29.

[31] *Black*, 26 S.W.3d at 900.

[32] *Moore v. State*, 999 S.W.2d 385, 399 (Tex. Crim. App. 1999).

[33] *See* Art. 34.01.

lost and destroyed records.[34] His reliance on this rule is misplaced because the rule has historically applied only when a record was made and later lost or destroyed.[35] Nevertheless, an error might be predicated on the failure to record proceedings, provided that the defendant lodged an objection to preserve that claim.[36] The trial court's findings on remand suggest that defense counsel had no way of knowing that the proceedings were not being recorded.

Assuming Appellant has not forfeited his complaint about the absence of a record, that complaint is without merit. If instead of being summoned for a special venire, the prospective jurors had first been summoned to a central jury room for such a proceeding, one would not expect that proceeding to be recorded. Because we have held that these proceedings should be viewed the same as proceedings conducted in a central jury room—not being a part of Appellant's trial and him generally having no right to be present—he would not have a right to have those proceedings recorded.

As alluded to above, a defendant has a statutory right to be present to hear and object to an economic excuse for not serving on a jury.[37] That does not mean, however, that he is entitled to have an Art. 35.03 proceeding recorded on the off-chance that the trial court would violate that right. Otherwise, a defendant would have the right to have central jury room proceedings recorded for that same reason. And Appellant points to nothing to suggest that a juror was in fact excused for an

---

[34] *See* TEX. R. APP. P. 34.6(f).

[35] *See Williams v. State*, 937 S.W.2d 479, 486 (Tex. Crim. App. 1996) (construing predecessor rule).

[36] *Id.* at 487.

[37] TEX. GOV'T CODE § 62.110(c).

economic reason.

Point of error thirteen is overruled.

### C. Conflict of Interest

In points of error nine and ten, Appellant contends that he was denied his right to counsel and his right to a fair and impartial tribunal. He claims that his attorneys gave the trial court confidential information in *ex parte* hearings and improperly delegated decisions to Appellant in order to protect themselves against possible ineffective assistance claims. He claims that the attorneys improperly delegated to him the choice of what witnesses to call and what evidence to present. He talks about his attorneys complaining that he wanted to control which witnesses they investigated, about his attorneys affording him the decision on which witnesses would testify, and about the attorneys affording him the decision on whether to present evidence of his criminal past at the guilt stage of trial. Appellant claims that his attorneys' conduct on these matters constituted a conflict between Appellant's interest in a favorable outcome for his case and his attorneys' interests in protecting themselves. He also claims that the trial court was not impartial because it acted to protect the attorneys interests' in contravention to Appellant's own.

But in *Monreal v. State*, we held that this type of situation did not involve a conflict of interest.[38] There, we said that the attorney was "not required to make a choice between advancing her client's interest in a fair trial or advancing her own interest in avoiding a future claim of ineffective assistance."[39] So her personal interest did not actually conflict with the defendant's

---

[38] *Monreal v. State*, 947 S.W.2d 559, 565 (Tex. Crim. App. 1997).

[39] *Id.*

interest.[40] This was true even if the attorney was "less than artful in executing her personal interest" and elicited unnecessary and potentially damaging information.[41] So the claim that the attorney's action to protect herself from an ineffective assistance claim worked to the client's detriment had to be analyzed under the traditional *Strickland* framework for ineffective assistance claims.[42]

Citing a more recent case,[43] Appellant contends that *Monreal* did not hold that *Strickland* applies when a defendant alleges a conflict because the counsel was acting to protect his own interests. We agree with this contention as far as it goes, but it does not go far enough. *Monreal* did not suggest that *Strickland* applies any time the defendant alleges a conflict with counsel's own interests,[44] but *Monreal* did find *Strickland* applicable to a claim similar to the one here—a claim that the attorney's own interest in protecting against an ineffective assistance claim created a conflict because of inartful attempts to protect that interest. We see nothing about the facts of this case that distinguishes it meaningfully from *Monreal*. At least ordinarily, an attorney's own interests in protecting against an ineffective assistance claim will not conflict with the client's interests. Overzealousness, mistakes, or malfeasance in protecting one's own interest in that regard is not sufficient to show a conflict; there has to be a showing that the *interest* itself is antithetical to the client. The whole point of a conflict is that it impugns the attorney's ability to represent the

---

[40] *Id.*

[41] *Id.*

[42] *Id.* (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

[43] *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007).

[44] *See id.* at 355-56 & n.31 (discussing *Monreal*).

defendant at all.[45]  All of Appellant's contentions simply allege that counsel should have engaged in different behavior to protect his otherwise non-conflicting interest of avoiding an ineffective assistance claim.  That does not show a conflict.

And because Appellant frames his challenge to his attorneys' conduct solely as a conflict of interest, he makes no attempt to show prejudice under *Strickland*.[46]

And even if we assume that the trial court was too deferential to Appellant's attorneys in their attempts to protect themselves, that does not establish that the trial court lacked impartiality.  Judicial rulings and a judge's efforts at courtroom administration almost never constitute a valid basis for finding bias or partiality.[47]  Absent an extrajudicial source of bias, a judge's actions during trial can show bias only if they reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible."[48]  That cannot be shown when the trial judge's manifest intent is to benefit the defendant and protect his rights.[49]

Here, the trial judge's conduct was manifestly intended for the defendant's benefit.  Because

---

[45] *See United States v. Bellille*, 962 F.3d 731, 743-44 (3d Cir. 2020) (constitutional conflict of interest disqualifies counsel from the case).

[46] *See Strickland*, 466 U.S. at 687 (prejudice is a component of an ineffective assistance claim; must show errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable").

[47] *Gonzalez v. State*, 616 S.W.3d 585, 593 (Tex. Crim. App. 2020) (citing *Liteky v. United States*, 510 U.S. 540 (1994)).

[48] *Gaal v. State*, 332 S.W.3d 448, 454 (Tex. Crim. App. 2011).

[49] *See Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013) ("By contrast, the remarks by the trial judge in the present case were made with the manifest intent to benefit the defendant and to protect his rights. The remarks were part of an extended effort to hammer home to the jurors that they should not hold a defendant's failure to testify against him.").

the jury, not the trial judge, was the factfinder at both guilt and punishment, the trial judge could receive confidential information without the risk of tainting the factfinder's decision-making. And as Appellant acknowledges, these hearings were held *ex parte*, so that the State was not privy to the discussions. The hearings involved explaining to Appellant the reasons behind his attorney's actions, explaining the advantages and disadvantages of various trial strategies, and ensuring that Appellant was satisfied with the particular course of action being taken. Appellant's own brief acknowledges that his attorneys complained that Appellant wanted to control aspects of the representation (what witnesses to investigate) that the attorneys did not think he could control. Giving Appellant control over many trial choices is consistent with a conclusion that Appellant wanted (and perhaps insisted on) as much control as possible.

Moreover, we have recognized that a trial judge is "obliged to respect the attorney-client relationship"[50] and that "any potential disruption of the relationship is subject to careful scrutiny."[51] A trial court's refusal to inject itself into the attorney-client relationship is not by itself a sign of bias or partiality on the trial court's part. Points of error nine and ten are overruled.

### D. Recorded Statements

In points of error three through seven, Appellant contends that the trial court erred in failing to suppress his recorded custodial statements to the Texas Rangers. He claims that parts of the statements were inadmissible because they were obtained in violation of *Miranda v. Arizona*[52] and Article 38.22 after he invoked his right to silence. He also claims that the statements were coerced

---

[50] *Buntion v. Harmon*, 827 S.W.2d 945, 948 (Tex. Crim. App. 1992).

[51] *Id.* at 948 n.3.

[52] 384 U.S. 436 (1966).

or involuntary in violation of constitutional and statutory protections and that constitutional and statutory requirements were violated because he did not knowingly, intelligently, and voluntarily waive his rights prior to the statements. In point of error eight, Appellant contends that the trial court should have instructed the jury on voluntariness under Section 7 of Article 38.22.

### 1. General Law on Confessions, Standard of Review, and Standard of Harm

Ordinarily, for an electronically recorded statement made by a defendant in custody to be admissible under Article 38.22, the officers taking the statement must, prior to the statement and on the recording, convey certain warnings outlined in the statute or their fully effective equivalent.[53] And the statute requires that the suspect knowingly, intelligently, and voluntarily waive the rights set out in the warnings.[54] The statute outlines the following warnings to be conveyed to the suspect:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.[55]

*Miranda* has a warnings and waiver requirement that is consistent with the Article 38.22

---

[53] *See* Art. 38.22, § 3(a)(2), (e)(2). *But see id.* § 3(c).

[54] *Id.* § 3(a)(2).

[55] *Id.* § 2(a).

requirements.[56] Giving the Article 38.22 warnings and waiving rights in accord with the statute is sufficient to comply with the *Miranda* requirements regarding the giving of warnings and the initial waiver of rights.[57] Other confession issues, such as whether *Miranda* rights are scrupulously honored and whether a confession is voluntary under due process or other aspects of state law, will be addressed later in this opinion when those issues are discussed.

Constitutional and statutory confession claims are evaluated under the bifurcated standard set out in *Guzman v. State*,[58] with questions of historical fact and questions that turn on credibility and demeanor being reviewed with deference to the trial court's ruling and application-of-law-to-fact questions that do not turn on credibility and demeanor being reviewed *de novo*.[59]

If a statement has been found to be admitted in violation of *Miranda* or due process, we apply the constitutional-error harm analysis, which requires the error to be found harmful unless the appellate court "determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[60] If a statement has been found to be admitted only in violation of a statute, then the harm analysis for non-constitutional errors applies, requiring the error to be found

---

[56] *See* 384 U.S. at 444-45.

[57] *See id.*

[58] 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[59] *State v. Lujan*, 634 S.W.3d 862, 865-66 (Tex. Crim. App. 2021) (Article 38.22 claims); *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020) (due-process involuntariness claim); *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012) (*Miranda* violation claims); *Maestas v. State*, 987 S.W.2d 59, 62-63 (Tex. Crim. App. 1999) (regarding whether *Miranda* rights were "scrupulously honored").

[60] Tex. R. App. P. 44.2(a).

harmless if it did not affect the defendant's substantial rights.[61] A substantial right is affected only if the error had "a substantial and injurious effect or influence" on the jury's verdict.[62] Stated another way, a substantial right is not affected if the appellate court has "fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect."[63] A different harm analysis applies to jury-charge errors, which we shall address in our discussion of Appellant's jury-charge claim.

### 2. The Interviews

Appellant was arrested at about 2:00 a.m. While still at the scene, Appellant's hands were tested for gunshot residue. Before taking custody of Appellant for purposes of transporting him to jail and before frisking him, State Trooper Jason Vela asked him if he had any weapons or guns or anything that could poke the officer. Appellant responded that he had "thrown the gun away already." He was then taken to the Willacy County Jail. At about 5:40 a.m., a DNA sample was obtained from Appellant.

Two Texas Rangers—Donato Vela and Patrick O'Connor—sat in an interview room with Appellant. Ranger Vela interviewed Appellant in Spanish. A transcript with an English translation was before the trial court as an exhibit at the suppression hearing, and a redacted version of the transcript was admitted at trial. The first interview began on August 4, 2014, at 6:37 a.m. The

---

[61] *Id.* 44.2(b).

[62] *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

[63] *Id.*

second interview occurred about two hours after the first interview ended.[64]

### a. First Interview

After asking and receiving from Appellant his name and date of birth,[65] Ranger Vela read Article 38.22 warnings.[66] When asked if he understood the rights that were read, Appellant nodded in agreement. Ranger Vela then read from a document with a signature line that said that Appellant knowingly, intelligently, and voluntarily waived his rights. Ranger Vela asked Appellant again if he understood his rights, and Appellant responded, "Yes, yes. That what I speak here, can be used against me?" Ranger Vela explained that these were official documents and that he needed "to know if you understood your rights, to begin with, and if you voluntarily want to speak with us." After a moment, Appellant responded, "Let's talk," and nodded affirmatively. Ranger Vela then directed Appellant to the signature line of the waiver document, and Appellant signed it. Ranger Vela asked, "Are you sure you don't want water or anything?"[67] and the interview began.

Appellant admitted to driving the red SUV. He claimed that he and the passenger were going to fish when he was shot at. He characterized the shots as being like marbles on the front glass window and said that he was hit in the eye and saw only black. He said they drove away after that to get away from being shot at. He said that they wandered aimlessly for awhile, not knowing the

---

[64] A review of the videos shows that the combined length of all oral interviews was approximately 2 hours and 25 minutes.

[65] Appellant was born on December 22, 1983, making him 30 years old at the time of the interviews in 2014. On the video at the beginning of the first interview, Appellant appears to be chewing something.

[66] The warnings, along with the rest of the interview, were in Spanish. Appellant does not claim that the Spanish-language warnings failed in any way to comply with Article 38.22.

[67] The transcript has Appellant's response as "(Unintelligible)."

area, and then arrived at a woman's house and asked for water. Appellant said that they were arrested, that the officers hit him on the head and back with a gun and kicked him, and that Appellant was ultimately brought to where the Rangers were interviewing him.

At this point in the interview, Appellant stated, "I want to go to sleep already." Ranger Vela responded that they needed to talk further, and the interview continued. Ranger Vela began going back through Appellant's story and confirming what he had previously said. He also confirmed that Appellant had an injury to his head and eye that appeared to be from a bullet graze. Appellant also mentioned his eye and said that the bullets "were coming in through the front window glass." Then Ranger Vela asked, "What else do you remember?" Appellant said he did not remember anything else and that "I am going to try to remember so that I can tell you everything."

Regarding Appellant's story, Ranger Vela then stated, "But we know that, that is not how things happened." Ranger Vela then launched into a long statement saying that some of what Appellant said was true but that he was not being honest about all of it, that they had already talked to others, including Appellant's passenger,[68] and that the Rangers already knew how things had happened. Appellant asked, "Then how did it happen?" Ranger Vela responded that something else happened and that Appellant and his friend "didn't just arrive there and people began to shoot you (both) just because."[69]

---

[68] For a discussion of that particular part of Ranger Vela's explanation in connection with a different point of error, *see infra* at part II.E.2.

[69] Unlike English, Spanish distinguishes between singular and plural forms of the word "you." The word used by Ranger Vela in Spanish was "ustedes"—the plural "you"—which was translated as "you (both)."

Ranger Vela asked Appellant if he needed water.[70]   Appellant responded, "I want to remember everything."  Ranger Vela asked if Appellant wanted to be given time, and Appellant said that he did.  Ranger Vela asked, "Why?"  Appellant responded, "I can't," and that his head did not feel well.  Ranger Vela continued to press Appellant for what really happened, and Appellant made various responses, including, "I don't remember," "I was drugged up, I think," and "Something is happening to me."  At some point, Ranger Vela said, "We know for a fact that you were in the truck. We know for a fact that you (both) were involved in this shooting.  Okay?  We know for a fact that you shot somebody and we know the motive.  Again, I am not saying that it was you, that, that was your intention.  But, if things turned out bad, we need to know that.  We need to know what exactly happened."

Shortly after that, Ranger Vela told Appellant that he was facing a capital felony charge, and the following colloquy occurred:

RANGER VELA: Do you know who the person whom you (both) shot is?

APPELLANT: No.

RANGER VELA: The person whom you and Ismael tried to rob?

APPELLANT: I don't know.

RANGER VELA: Do you know what the punishment for a capital felony is?

APPELLANT: I will be killed.

RANGER VELA: .—and jail for life. It doesn't matter that you are Mexican.  It doesn't matter that you are an illegal (alien) here. The punishment is going to—the

---

[70]  At some point, the interview video shows a bottle of water next to Appellant.

punishment is going to take place here (overlap)—in the United States.[71]

APPELLANT: It has to be punished.

But then Appellant reiterated his original story: "That we arrived and they started shooting." Ranger Vela urged Appellant to tell the truth. At one point he said, "[W]e are going to reach a point in court when we are going to talk to them before trial and they are going to say: 'When you spoke to Gustavo and with other guys—the other guy, Ismael; were they honest with you; did they tell you?' Our answer will be: 'Yes or no.' I am not saying that this is going to affect you or not; it may or may not affect you in court." In response to this and further admonitions to tell the truth, Appellant said that he "took a pill" and he did not remember.

Ranger Vela asked about "the pistol" and whether he was carrying it on his waist. Appellant replied, "No, I didn't have it with me." When asked if the passenger had it, Appellant responded, "I think so, yes. I am not sure; I don't want to lie to you. Isn't it in the truck?" After further questioning, Ranger Vela said, "Going back to the pistol. You stated that you remember that Ismael had it. When you got off the truck, at the time the truck stalled—And I thank you, Gustavo, that you are remembering, I thank you for that." Appellant responded, "Yes, but I don't want to continue talking (unintelligible) anymore right now, please." Ranger Vela then responded, "Let me ask you a question; only answer me this: Do you think that you all threw it in the brush?" Appellant replied, "I don't know. I would imagine that maybe it is in the brush. I don't know." Ranger Vela then asked if Appellant was positively sure he did not have it, and Appellant responded that he did not know but then admitted that he had the pistol for a while. When asked if he remembered having the

---

[71] Throughout this opinion, in quoting from the transcripts, we have replaced ellipses with dashes to avoid confusion because the ellipses denoted pauses in the discussion rather than the omission of material.

pistol in his vehicle, Appellant responded, "Yes, I—like I told you; I don't want to continue talking right now." Ranger Vela then asked, "Why?" and Appellant responded that he did not know and could not remember. After that Ranger Vela suggested taking a break, and Appellant responded that he wanted to sleep. The rangers terminated the interview.[72]

### b. Second Interview

At the beginning of the second interview, Ranger Vela asked Appellant if he understood his rights, and Appellant said, "Yes." Ranger Vela asked if Appellant wanted the rights read to him again, and he responded, "No. I already understood them." But Ranger O'Connor interjected, "Read them one more time," and Ranger Vela read the Article 38.22 warnings. He also read a statement that Appellant had waived the rights "in this document" of his "full knowledge, intelligence, and free will," and Appellant acknowledged his signature to a waiver-of-rights form.

When asked what he remembered, Appellant responded, "I did fire" but that "they fired first." When asked to clarify "they," Appellant responded, "There were two there. They fired and I fired back; and, well, I am guilty." When asked what he and his passenger were in agreement to do, Appellant responded, "To go there with them. Not to kill anybody or anything." When asked if Appellant and his passenger went only to rob a person, Appellant responded, "Because they threatened me." When asked who threatened him, Appellant said that they were people in Weslaco to whom he owed money who told him that, if he did not give them the truck, they would kill his parents. He also suggested that his wife was afraid and that the people threatening him threatened to kill his family in Mexico. After being questioned a while about this particular story, Appellant

---

[72] Between the time Appellant said that he did not want to continue talking and the end of the interview was 1½ pages of the 47-page transcript.

said, "It was a mistake, I have to pay the price." While Ranger Vela continued pressing for Appellant to tell the truth, Appellant said, "I don't want to talk about this anymore, sir," and, "I want to talk to my family." Ranger Vela responded, "Okay. Tell me only one thing. What happened to the gun?" Appellant replied, "It got lost in the parcel (track of land). I don't know where we dropped it; we dropped it." In response to subsequent questions, Appellant said that the gun was "dropped in the brush," and when asked what caliber the gun was, Appellant said it was a ".45."[73]

### c. Suppression Hearing Testimony about the Circumstances Surrounding the Interviews

A suppression hearing was held before trial and another one was held during trial. Appellant testified that he was initially detained in a small office by a police sergeant and kept on the floor and that he was not given food or water. He said that he told the sergeant that he did not want to talk to anyone but that the sergeant said, "Talk to me. I will help you." Appellant testified that he was later moved to another room and told by officers that they had received calls from individuals threatening to kill Appellant. He affirmed that he had not slept for 24 hours at the time of the interviews. Appellant also testified that while he was handcuffed, an officer punched him in the stomach so hard that he vomited.

Appellant acknowledged that he was given Article 38.22 warnings, but he claimed that he did not understand that he had a right to remain silent and a right to an attorney at the time of questioning. Appellant claimed that his tiredness affected his rational thinking. Appellant also said that he was not informed of his right to contact the Mexican consulate.

When asked about Ranger Vela's statement in the first interview that certain information may

---

[73] The interview continued for a substantial period of time, followed by three more recorded interviews, but none of the recorded interviews past this point were admitted before the jury.

or may not affect Appellant in court, Ranger O'Connor replied that such a statement did not comport with the *Miranda* warnings. Both rangers testified that Appellant was taken back to his cell and slept between the interviews. Appellant, however, testified that he was taken to another room to speak with officers and did not sleep. When asked why Appellant was not taken for treatment for his injuries, Ranger O'Connor testified that he thought that Appellant's injury did not seem serious.

### d. Trial Court's Findings of Fact

When we originally received the record, there were no findings of fact regarding the voluntariness of Appellant's recorded statements. Appellant's fifth sub-argument under point of error seven contends that the case should be remanded for findings. Footnote eleven of the State's brief says that the State has "no opposition to remanding this issue to the trial court should this Court deem additional factual development necessary."

Section 6 of Article 38.22 requires written findings when the voluntariness of a confession is litigated and the trial court finds the confession to be voluntary and admissible.[74] We have held that the statute requires written findings even when they are not requested because "written findings are required in all cases concerning voluntariness" and "[t]he statute has no exceptions."[75]

We requested findings from the trial court, and those findings have now been made and

---

[74] Art. 38.22, § 6 ("If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause.").

[75] *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013).

forwarded to us.[76]

The trial court concluded that Appellant "fully understood his constitutional and statutory rights" and that he "freely, knowingly, intelligently, and voluntarily waived his constitutional and statutory rights" before making any statements to Ranger Vela. The court further found that "[n]o force was used or promises made in order to persuade" Appellant to waive his rights or make statements and that Appellant made his statements "free of any threats, compulsion, or coercion." The trial court also found that Appellant was not deprived of basic necessities or questioned for an unreasonable amount of time and that he did not at any time during this interview assert his right to remain silent, request counsel, or ask to terminate the interview. Addressing several statements by Appellant regarding his desire to sleep, to not continue talking, or to talk to family members, the trial court concluded that they were at best ambiguous and equivocal with respect to any desire to end interrogation.

The trial court also concluded that Appellant was given an opportunity to sleep for approximately two hours between the first and second interviews.

### 3. Honoring the Right to Silence

Appellant contends that parts of his recorded statements were inadmissible because they were made after he invoked his right to remain silent and to terminate the interview and that their admission violated *Miranda*.[77]

---

[76] Judge Lopez, who had presided over the suppression hearing and trial, is not the current judge of the trial court, but it was determined that Judge Lopez was eligible to make findings and she was assigned to do so. Because Judge Lopez was in fact the trial judge during the suppression hearing and at trial, we will hereafter refer to her findings as those of the trial court.

[77] Appellant also claims a violation of Article 38.22 but does not claim that Article 38.22 provides different or more expansive protection than provided by *Miranda* with respect to honoring

Under *Miranda*, law enforcement officers are required to respect a defendant's invocation of his right to remain silent by cutting off questioning.[78] A suspect's right to cut off questioning must be "scrupulously honored."[79] But a suspect's invocation of this right must be unambiguous, and there is no requirement that law enforcement clarify ambiguous remarks.[80] A statement that a person "needs to rest" is not an unambiguous invocation of the right to cut off questioning.[81]

Once a person has unambiguously invoked his right to cut off questioning, a resumption of questioning is permissible only if it is consistent with scrupulously honoring the defendant's invocation.[82] That inquiry depends on the balancing of five factors: (1) whether the suspect was informed of his right to remain silent prior to the initial questioning; (2) whether the suspect was informed of his right to remain silent prior to the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether the subsequent questioning focused on a different crime; and (5) whether police honored the suspect's initial invocation of the right to remain silent.[83] We have held that resumption of questioning after two hours was

the right to cut off questioning. Consequently, we focus only on Appellant's *Miranda* claim. *See Ex parte Ingram*, 533 S.W.3d 887, 891 n.4 (Tex. Crim. App. 2017) (because the defendant did not argue that state constitutional provisions provided greater or different protection than their federal counterparts, court did not separately address state constitutional claims). We need not and do not address whether Article 38.22 even has an equivalent to the *Miranda* "scrupulously honored" requirement. *See infra* at nn.78-79 and accompanying text.

[78] *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

[79] *Id.*

[80] *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

[81] *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996).

[82] *Maestas*, 987 S.W.2d at 60-62.

[83] *Id.* at 62.

permissible when the defendant requested "a little more time" before talking and was given a new set of *Miranda* warnings before the second interrogation.[84]

Appellant's statement in the first interview that he wanted to sleep was not an unambiguous invocation of his right to cut off questioning. We will assume that his later statement, "I don't want to continue talking anymore right now," was an unambiguous invocation and that the subsequent statement, "Like I told you; I don't want to continue talking right now" was a reiteration of that invocation. This would make some parts of the first interview inadmissible: his admission that he possessed the pistol for a while, that he imagined the pistol was in the brush, and that he remembered the pistol being in the SUV. We will also assume that his later statement in the second interview, "I don't want to talk about this anymore, sir," was an unambiguous invocation of his right to cut off questioning. That would render inadmissible the later statements about what happened to the gun and the caliber of the gun.

But this did not render all of the statements in the second interview inadmissible. Appellant was informed of his rights before both the first and second interviews. Although the passage of two hours might not seem to be a long time, Appellant's statements in the first interview that he did not want to continue talking "right now" and that he wanted sleep suggested that a brief pause to get some sleep was what he wanted. Although Ranger Vela did not immediately honor this request, Appellant was given a two-hour break during which he could sleep. Appellant testified that he was not permitted to sleep, but the trial court was free to believe the rangers' testimony to the contrary

---

[84] *Phillips v. State*, 701 S.W.2d 875, 891 (Tex. Crim. App. 1985), *overruled on other grounds by*, *Hernandez v. State*, 757 S.W.2d 744 (Tex. Crim. App. 1988) (defendant asked for "a little more time," was removed from the interview room, and was approached for resumed interrogation two hours later). *See also Murphy v. State*, 766 S.W.2d 246, 249-50 (Tex. Crim. App. 1989) (discussing *Phillips*).

and in fact found that Appellant was given the opportunity to sleep for two hours. And the warnings were read again before the second interview even though Appellant indicated that they were not necessary. And Appellant gave new information in the second interview, not traceable to his earlier admissions, when he talked about firing a gun, being "guilty," and trying to rob the Vega family because he had been threatened.

The question then is whether the errors in admitting the latter portion of the first interview and the latter portion of the second interview were harmless. Before Appellant invoked his right to cut off questioning the first time, he had already admitted to the following incriminating facts: (1) he was the driver of the red SUV, (2) he encountered the Vega family, (3) shots were fired (by the Vega family), (4) Appellant had thrown away a gun or that a gun had been possessed by the passenger, and (5) there was a crime that "ha[d] to be punished." Appellant also said that he had taken drugs and did not remember things. Facts (1) through (3) established unequivocally that Appellant was present during the crime and was the driver. This eliminated any possible defense based on mistaken identity. And if the jury believed the eyewitness testimony that the driver shot Harvey, it meant that Appellant was the one who killed Harvey. Facts (4) and (5) further tended to incriminate Appellant by suggesting that he did more than just run away from being shot.

At worst, the allegedly inadmissible admissions made in the latter part of the first interview and the latter part of the second interview were minor points: admitting to personally possessing a firearm, knowing the firearm's location, and knowing that the firearm was a .45. This is especially true when one considers that Appellant tested positive for gunshot residue. And he had already at least impliedly admitted to possessing a gun and knowing its location when he told a state trooper that he had already thrown the gun away.

And then there were the more incriminating facts admitted in the early part of the second interview: that Appellant fired the gun, was "guilty," and tried to rob the Vega family because he was threatened. This further attenuates any significance attaching to the allegedly inadmissible statements. We conclude beyond a reasonable doubt that any error in admitting the latter portion of the first interview and the latter portion of the second interview did not contribute to the jury's determination of his guilt or punishment and, therefore, was harmless.

But what if the incriminating facts in the earlier part of the second interview were added to Appellant's side of the ledger instead of to the State's? That is, what if we were to hold that the entire second interview was inadmissible due to Ranger Vega's delay in honoring Appellant's request to pause the first interview? The errors would still be harmless beyond a reasonable doubt. Although the facts elicited in the second interview were far more incriminating than the facts elicited in the latter part of the first interview, the facts elicited in the earlier part of the first interview were of primary importance. The jury had undisputed evidence that Harvey was shot and killed, and it had the testimony of three eyewitnesses that the driver of the red SUV was the shooter. Plus, it had the evidence of gunshot residue on Appellant's hands. With the second interview, Appellant at least had his self-serving claim that he did not shoot first but shot back. Without that interview in evidence, Appellant's position would appear to have been that only the Vega family did the shooting. That was a totally implausible position, given the undisputed fact of Harvey's death, the injury suffered by Harvey's father, and the gunshot residue on Appellant's hands. And while Appellant admitted to being "guilty" in the second interview, he was claiming what might have amounted to self-defense.[85] Regardless, Appellant admitted during the first interview that there was a crime that

---

[85] The guilt-stage jury charge had a self-defense instruction.

"ha[d] to be punished," also an arguable admission of guilt.

Appellant argues that the second interview was crucial because it supplied the only evidence that the shooting occurred during a robbery or attempted robbery. We disagree. Although it would seem helpful to the State to have evidence that accosting the Vega family was part of a robbery or attempted robbery, what else could it have been? We have said that it is an "unlikely supposition" that there exists "a motive-less killer."[86] Appellant's statements in the earlier part of the first interview did not supply any possible motive other than greed. Appellant did not know the victim or any of the other people with him. It is apparent from the interview that he did not even know that Harvey was a border patrol agent. The red SUV initially following the Vega family vehicles, backing away, and then returning later is consistent with casing the Vega family and the fishing site for a robbery. Commanding the Vega family to get on the ground is consistent with attempting to facilitate the theft of property (and thus a robbery). Appellant was not able to do more to effectuate a robbery because the intended victims did something he did not expect—they shot back. We do not harbor any reasonable doubt about what the jury would conclude this was—an attempt to rob the Vega family that was thwarted by the Vega family fighting back.

### 4. Coercion

Appellant contends that his recorded statements were inadmissible in their entirety because they were coerced, in violation of due process.[87] He contends that his statement bears the hallmarks

---

[86] *Butler v. State*, 769 S.W.2d 240 (Tex. Crim. App. 1989), *overruled on other grounds by*, *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991).

[87] Appellant does point to broader protection conferred by statute beyond what is conferred by due process. We address that claim of broader protection in connection with his statutory involuntariness claim later in this opinion.

of coercion because he was physically attacked by border patrol officers, did not receive medical care, was told that people had threatened to kill him, was in fear of his life, had not been given food, and had not been allowed to sleep. He also complains that he was not informed of his right to contact the Mexican consulate in violation of Article 36 of the Vienna Convention on Consular Relations. And he claims that the Rangers' failure to honor his right to cut off questioning created a coercive environment.

A confession is coerced in violation of due process if the suspect's "will has been overborne and his capacity for self-determination critically impaired."[88] Factors taken into account in addressing this question are "the youth of the accused, his lack of education or his low intelligence, the lack of any advice about constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."[89] But even with these factors, an essential element of any due-process involuntariness claim is law-enforcement overreaching.[90] A suspect's lack of sleep, alone, does not make a statement coercive in violation of due process.[91]

Most of the factors do not favor a conclusion that Appellant's will was overborne. Appellant was not young—he was 30 years old at the time he gave the statement—and he does not point to anything suggesting that he lacked education or intelligence. It does appear that his primary, and perhaps sole, language was Spanish, but the interviews were conducted in Spanish. The elapsed time

---

[88] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[89] *Id.* at 226 (citations omitted).

[90] *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

[91] *Contreras v. State*, 312 S.W.3d 566, 575 (Tex. Crim. App. 2010).

for all interviews combined was approximately 2 hours and 25 minutes, which does not seem particularly long, especially for a capital murder case. Appellant was given complete Article 38.22 warnings at the beginning of each of the two recorded interviews, and while Ranger Vela continued the first interview after Appellant first said he did not want to continue talking, this continued questioning was brief, and questioning did cease after Appellant reiterated his request.

Appellant's claims of mistreatment are based solely on his own testimony, which the trial court was free to disbelieve. And in fact, the findings indicate that the trial court did not believe Appellant's testimony in this regard.[92]

As for lack of sleep, some lack of sleep was inevitable given that Appellant appears to have fled until law enforcement caught up with him at 2:00 in the morning. But the claim that he was not allowed sleep between the two interviews is based solely on his own testimony, which the trial court was free to disbelieve and did disbelieve. Also, tiredness by Appellant does not by itself show that his will was overborne so that his capacity for self-determination was impaired.

As for lack of medical care, Appellant acknowledges that Ranger O'Connor did not believe the injury to be serious. Appellant has not shown that Ranger O'Connor's assessment was incorrect, nor has he shown that this purported injury pressured him to make incriminating statements. We conclude that Appellant has not shown that his will was overborne by official misconduct.

As for Appellant's claim that he was not informed of his rights under Article 36 of the

---

[92] On the video, Appellant can be seen chewing at the beginning of the first interview, which suggests that he had something to eat. But even if one believed that Appellant had nothing to eat prior to the first interview, Appellant does not point to anything in the record showing that he asked for food during that time, and the interview was not held during a normal mealtime. The transcript and the video show that Appellant was offered water. And even if Appellant was told about threats on his life and was assaulted by border patrol agents, he does not show how that would persuade him to confess to the Texas Rangers, whom he does not claim physically assaulted or threatened him.

Vienna Convention on Consular Relations, the Supreme Court has held that exclusion of evidence is not an appropriate remedy in that situation.[93] And the Supreme Court has said that a failure to inform an accused of his right under Article 36 "is unlikely, with any frequency, to produce unreliable confessions" and that "there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police."[94] Given the other voluntariness factors we have discussed above, the failure to inform Appellant of his right to contact the consulate did not cause otherwise voluntary statements to become coerced.

It is true that the Rangers continued to interview Appellant after his statement in the second interview that he did "not want to talk about this anymore." That fact is not sufficient, under the circumstances of this case, to cause what was said afterwards to have been coerced in violation of due process. Regardless, little was admitted into evidence after this statement. The only information not found earlier in the recordings was Appellant's admission that he knew the gun was a .45. Even assuming that this part of his statement was inadmissible, any error was harmless for reasons we have stated earlier.

### 5. Knowing, Intelligent, and Voluntary Waiver

### a. Voluntariness and Understanding of Initial Warnings

Appellant contends that his waiver of his rights was not voluntary because he was subject to food and sleep deprivation, physical violence by Border Patrol agents who arrested him, lack of care for his physical injury, and threats against him. These arguments are the same arguments he made for finding the recorded statements to be coerced, and the same reasons for rejecting them in

---

[93] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347-50 (2006).

[94] *Id.* at 349.

connection with that claim apply here. He also claims that officers told him that they could not go to the District Attorney without information from him, that he signed the *Miranda* waiver because he thought he had to, and that threats had been made against his family. These additional arguments depend on statements made by Appellant—during the suppression hearing or in the recorded interviews—which the trial court was free to disbelieve. Given the findings, it is clear that the trial court did not in fact believe these statements from Appellant.[95]

Appellant also contends that he did not understand that, by signing the waiver, he was waiving his right to remain silent and his right to a lawyer, and he claims that he did not understand specific terms in Spanish read out to him from the *Miranda* waiver. These arguments also depend on Appellant's testimony, which the trial court was free to disbelieve and did disbelieve, given the findings. Moreover, Appellant indicated on the first recording that he understood his rights, and on the second recording, he said that the warnings need not be re-read because he understood them.

### b. Effect of Subsequent Events on Understanding of Warnings

Appellant claims that Ranger Vela undermined the validity of his waiver of rights with respect to the second recorded interview when he disregarded Appellant's invocation of his right to cut off questioning. This argument is really just another way of stating his contention that the failure to scrupulously honor his right to cut off questioning during the first statement extended to the

---

[95] Also, the only evidence of threats against Appellant's family appears to be Appellant's statement in the second recorded interview that he tried to rob the Vega family because people he owed money to had threatened his own family. We fail to see how Appellant would feel pressured to confess to the police because he or his family had been threatened by non-law-enforcement creditors at some time in the past. In connection with another claim, Appellant speculates that these could have been the same people that he alleges called the police to threaten his own life. He made no such assertion during the recorded interviews, and we find it unlikely that, early in the morning, less than half a day after the shooting, non-law-enforcement creditors found out he was incarcerated and called the *police* to threaten Appellant.

second statement. We addressed and rejected that contention under the "Honoring the Right to Silence" subsection of this opinion. Moreover, the sequence of events shows that Appellant was able to successfully terminate the first interview by asserting his right to cut off questioning a second time. At worst, that sequence would have conveyed that Appellant could have his right to cut off questioning honored if he persistently asserted it. Consequently, we have no reason to think that he did not understand that he did not have to agree to the second interview.

Appellant also claims that Ranger Vela undermined the waiver with respect to the second recorded interview by saying, contrary to the *Miranda* and Article 38.22 warnings, "I am not saying this is going to affect you or not; it may or may not affect you in court." Saying that a confession can be used "for or against you" is an improper warning that does not comply with Article 38.22.[96] Appellant does not dispute that all of the warnings given at the beginning of each recorded interview complied with Article 38.22. Rather, he claims that Ranger Vela's statement here was an additional statement in the middle of the first interview that was contrary to the Article 38.22 warning that a statement may be used against the defendant.[97] Ranger Vela's "may or may not affect you in court" statement, however, was talking about the *Rangers* telling the prosecutor whether or not the defendant was honest during the interview. Ranger Vela was saying that such a statement by the Rangers to the prosecutor "may or may not affect" Appellant in court. This in no way undermined the Article 38.22 warning that whatever *Appellant* said might be used against him.

But even if the waiver as to the second interrogation were rendered invalid for the reasons

---

[96] *Dinkins v. State*, 894 S.W.2d 330, 348-49 (Tex. Crim. App. 1995).

[97] *See* Art. 38.22, § 2(a)(1) (" . . . and that any statement he makes may be used against him at his trial"), (2) ("any statement he makes may be used as evidence against him in court").

Appellant suggests, any error in admitting the second recorded statement was harmless for reasons stated earlier in the "Honoring the Right to Silence" subsection. And even if we went back to the first interview and held that Ranger Vela's "may or may not affect" statement rendered inadmissible what was said afterwards, facts (1), (2), (3), and (5) from the first interview would still have been admitted, along with the first half of fact (4) from Appellant's arrest-scene statement, and our conclusion that any error is harmless would still be valid.

### 6. State-of-Mind Voluntariness Under Article 38.22

Appellant further claims that his recorded statements were involuntary under state law due to his state of mind. He claims that he was "sleep-deprived, injured, ill, and intoxicated from drugs." He also claims that he feared for his life and his family's life prior to and during his statements. A state-law claim of involuntariness under Article 38.22 may, but need not, be predicated on law-enforcement overreaching.[98] A confession can be involuntary under state law if it is given "under the duress of hallucinations, illness, medications, or even a private threat."[99] A confession can be involuntary under state law if the suspect lacked the mental capacity to understand his rights or if, due to a temporary mental condition, he did not understand what he was confessing to.[100] But "youth, intoxication, mental retardation, and other disabilities are usually not enough, by themselves, to render a statement inadmissible."[101]

Appellant claimed both lack of sleep and that he was on drugs. As we indicated earlier, some

---

[98] *Oursbourn v.State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008).

[99] *Id.*

[100] *See id.* at 172-73.

[101] *Id.* at 173.

lack of sleep was inevitable given the lateness of the arrest, though how much that affected Appellant was something the factfinder could decide. The finder of fact was free to disbelieve the drug claim. And even if the finder of fact believed that Appellant was tired and under the influence of drugs, that would not alone require a conclusion that Appellant lacked the mental state needed to make a voluntary confession. Appellant said that he understood his rights and agreed to waive them. He specifically noted his understanding that what he said could be used against him. At the beginning of the second interview, he insisted that the warnings did not need to be read again because he understood them. Appellant's statements during the interviews suggested that he could think rationally. Without being told, Appellant understood that a capital offense carried the death penalty. And he was able to articulate a coherent and exculpatory version of events in both interviews—claiming in the first interview that he was the victim of an unprovoked attack by the Vega family and claiming in the second interview that he shot at the Vega family but only in response to them shooting first. The trial court was well within its discretion to conclude that Appellant was not suffering from a mental condition that would have caused his statement, or his waiver of rights, to be involuntary.

As for Appellant's claim that private threats rendered his statement involuntary, that claim depended on Appellant's suppression-hearing testimony and recorded-interview statements, all of which the trial court was free to disbelieve.[102]

But even if all of Appellant's recorded statements were admitted in violation of statute, we are convinced that any possible error did not influence the jury or had but slight effect and thus was

---

[102] Even if we believed that private actors called in threats to the police or that pre-offense threats were made against Appellant's family, we would find those insufficient to render Appellant's statement involuntary under state law. *See supra* at nn.92, 95.

harmless under the standard for non-constitutional errors. Even without his statements, Appellant was connected to the abandoned red SUV by bloodstains in the vehicle matching his DNA. Three witnesses identified Appellant as one of the two men who attacked the Vega family, two of those witnesses identified Appellant as both the driver and the person who shot Harvey, and an additional witness testified that Harvey was shot by the driver. Two witnesses testified that Appellant instructed the Vega family to get down on the ground. A gun that was consistent with the bullet that killed Harvey and with shells at the crime scene was found near the scene of Appellant's arrest. Appellant had gunshot residue on his hands. And without Appellant's recorded statements, there would be no evidence that the Vega family shot first or that Appellant was defending himself. The testimony that Appellant and his accomplice fired shots without provocation would have been uncontroverted.

Having rejected all of Appellant's claims regarding the admission of his recorded statements, we overrule points of error three through seven.

### 7. Jury Instruction

In point of error eight, Appellant contends that the trial court erred in failing to include an Article 38.22 warnings instruction in the jury charge pursuant to Section 7. Article 38.22, Section 7 provides: "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement."[103] We have held that the phrase "the issue" refers to compliance with statutory warnings and the voluntariness of the defendant's waiver of rights.[104] For the issue to be "raised by the evidence," there must be a "genuine factual dispute" on

---

[103] Art. 38.22, § 7.

[104] *Oursbourn*, 259 S.W.3d at 176.

a material issue.[105]

Appellant contends that the evidence raised two factual disputes. First, he contends that there is a factual dispute about whether Ranger Vela "contradicted the *Miranda* warnings and told Appellant that information he provided in his statement 'may or may not affect him in court.'" He points to testimony from Ranger O'Connor that he thought that Ranger Vela was talking about punishment. Second, he contends that there was a factual dispute about whether Appellant clearly invoked his right to cut off questioning. He points to testimony by both Rangers Vela and O'Connor that Appellant did not clearly invoke this right. He claims that the Rangers' testimony on both these points created a fact issue because it conflicted with what was shown to have happened on the recordings.

We see no factual disputes. Appellant does not contend that there was a dispute about the accuracy of the English translation of the recorded statements, and none of the testimony he points to suggests that there was a translation error. Consequently, we accept the translation as definitive on what was actually said during the recording, and once that is done, what was actually said is not, and cannot, be in dispute.[106]

Moreover, even if the Rangers' testimony could create a factual dispute by contradicting what is reflected on the recording, we see no factual conflict between their statements and the recording. In both instances, the testimony did not dispute what was actually said but gave what amounted to an opinion about the legal effect of what was said. Whether the "may or may not" statement related

---

[105] *Id.*

[106] *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (referring to a videotape as presenting "indisputable visual evidence" that contradicted a witness's testimony and precluded us from according probative weight to that testimony).

to guilt or punishment and whether Appellant's "I don't want to talk anymore right now" statement was an unambiguous invocation were legal questions, not factual disputes.[107]

Appellant did create factual disputes at the suppression hearing through his testimony, but he did not testify at trial, so none of those disputes were before the jury. Consequently, we have no occasion to determine whether any of those disputes would have been material.

Even if there were error, it would be harmless. Appellant concedes that he did not raise these complaints at trial, and so he could obtain a reversal only on a showing of egregious harm.[108] "Egregious harm is a difficult standard to meet."[109] It is a more difficult standard than the harm standard for constitutional error, and we have already held that, even if everything Appellant said after the two events in question was inadmissible, error in admitting the evidence would be harmless under the constitutional standard.[110] Point of error eight is overruled.

### E. Other Evidentiary Complaints

### 1. Extraneous Offense

---

[107] *See Robinson v. State*, 377 S.W.3d 712, 720 (Tex. Crim. App. 2012) ("[W]e perceive no material *factual* dispute in this case, only a dispute among the witnesses with respect to the legal signficance of what are, in essence, undisputed facts.") (emphasis in original).

[108] *Oursbourn*, 259 S.W.3d at 165.

[109] *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).

[110] *See supra* at part II.D.3 and part II.D.5.b. We also note that Appellant's guilt stage jury charge included a general instruction on voluntariness pursuant to Article 38.22, Section 6, to wit: "You are instructed that under our law a statement of a Defendant made while under arrest or in custody, may not be used in evidence against the defendant unless it appears that the statement was freely and voluntarily made without compulsion or persuasion. Now, therefore, if you find from the evidence, or if you have a reasonable doubt thereof, that the Defendant's statement, if any, was not voluntary, then you will completely disregard such statement as evidence for any purpose nor will you consider any evidence obtained as a result thereof."

In point of error nineteen, Appellant contends that the trial court erred in denying a mistrial after a witness testified to seeing, on a phone described as Appellant's, photographs of bundles of marijuana. At trial, the State questioned Ranger O'Connor about a cell phone that was collected at the time of Appellant's arrest. When asked who the phone belonged to, Ranger O'Connor responded that he believed it to be Appellants's and that "[t]here were numerous photographs of him in the phone, also large bundles of marijuana." Defense counsel objected to the marijuana remark. Outside the jury's presence, the State responded that Ranger O'Connor's remark was unanticipated. The trial court denied Appellant's request for a mistrial, but, when the jury was called back in, it gave the jury an instruction to disregard "the last statement made by this witness."

Assuming the reference to bundles of marijuana would have been inadmissible as a reference to an extraneous offense, we conclude that the trial court did not err in denying the mistrial. The trial court gave an instruction to disregard, and ordinarily a prompt instruction to disregard will cure error associated with an improper question and answer.[111] And generally, such an instruction will cure prejudice from a witness's inadvertent reference to an extraneous offense[112] or from a nonresponsive answer.[113] An instruction to disregard is more likely to cure prejudice when the improper reference is isolated.[114] Ranger O'Connor's reference to bundles of marijuana was an isolated, nonresponsive answer and the trial court's instruction to disregard was prompt, occurring immediately after the jury

---

[111] *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003).

[112] *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009).

[113] *Lackey v. State*, 638 S.W.2d 439, 456 (Tex. Crim. App. 1982).

[114] *See Shannon v. State*, 942 S.W.2d 591, 598 (Tex. Crim. App. 1996) (improper prosecutorial comment that the defendant was a sociopath was isolated and cured by prompt instruction to disregard).

was brought in after the hearing outside its presence.

Appellant contends that the extraneous offense would have stood out in the jurors' minds because no other extraneous offenses were admitted. We decline to draw an inference that a single inadvertently mentioned extraneous offense must have had an outsized influence despite the instruction to disregard.

Appellant contends that harm was shown because the jury sent out a note during penalty deliberations asking if he was affiliated with a gang or cartel. But this note at the punishment stage does not show that the jury was concerned about whether he had such affiliations at the guilt stage. At punishment, the State introduced a judgment of conviction for possession of marijuana in the amount of 2000 pounds or less but more than 50 pounds. That judgment connected Appellant to a large amount of marijuana, which would have been a far more substantial basis for a concern about gang or cartel involvement than the brief remark at the guilt stage that the jury was instructed to disregard. Also, whether Appellant was a member of a cartel would more naturally be relevant at the punishment stage of trial than at the guilt stage.

Appellant also contends that there were significant questions about whether he had the requisite mental state for capital murder because he admitted to firing a gun but denied knowing at whom he had fired. He points to his second recorded interview in which he claims that he did not remember who he fired at. That lack of memory would in no way undermine a conclusion that he fired at one of the Vega family members with the intent to kill him. Appellant also points to the testimony indicating that the bullet that struck Harvey first ricocheted off the magazine of Harvey's own firearm. Even assuming such a richochet, we do not see this evidence as raising a substantial question about Appellant's guilt. Appellant also points to his statement that the Vega family shot

first, and he claims that there is an absence of any evidence that he or the co-defendant took or attempted to take any of the Vega family's possessions. As we explained in connection with the points of error relating to his recorded statements, Appellant or possibly his passenger commanded the Vega family to get down on the ground while shooting at them. The fact that nothing was stolen is explained by the fact that the Vega family fired back, forcing Appellant and his passenger to flee. And Appellant's second statement admits that he intended to rob the family. Even if that second statement were excluded from consideration, that would leave the story of the Vega family doing the only shooting, which was not a credible story given Harvey's death, the father's injuries, and the gunshot residue on Appellant's hands. But even if Appellant had a credible defensive position, that would not invalidate our conclusion that the trial court's instruction to disregard would have cured any error. Point of error nineteen is overruled.

## 2. Co-Defendant's Statement

In point of error twenty, Appellant contends that the trial court erred in admitting a reference by Ranger Vela, in Appellant's first recorded interview, to a statement made by Appellant's passenger, who was a co-defendant. He claims that, because the passenger did not testify and therefore could not be cross-examined, the admission of this reference violated his Sixth Amendment right to confrontation.

The trial court had ordered redactions of the English translation of the first recorded interview to take out statements allegedly made by the passenger. Defense counsel objected that the redactions were incomplete and pointed to a particular passage. He did not request a limiting instruction. The passage at issue reads as follows:

> This guy also talked. He already told me his version of how things happened. We are
> not trying to play games with you, or trying to play tricks on you, or trying to put

things on your head, nor anything like that. Okay? Simply, Gustavo—it is simply that we already know how the events happened. Look, if you (both) went there, you were going to try to—Let's say how things are. Okay?—to attack those people or you needed money, or I don't know; I don't know what your motives were and—Hey, things turned out wrong because sometimes things turn out wrong and shit hit the fan there; the shooting began and all that shit and then, obviously that you have to run away.

This passage was part of the long explanation that Ranger Vela had given Appellant for saying, after hearing Appellant's initial story, that the rangers "know . . . that is not how things happened."[115]

The passage was relevant to show the context in which Appellant made various statements in the recorded interview. It was also relevant to the issue of the voluntariness of Appellant's recorded interview as a whole, an issue that was submitted to the jury.[116] These were non-hearsay purposes, as they do not involve proving the truth of any matters asserted by the passenger,[117] and even a non-testifying co-defendant's statement can be admitted for a non-hearsay purpose without violating the Confrontation Clause.[118] Because the passenger's statements were part of Ranger Vela's questioning, it is manifest that the State was not attempting to introduce the statements to show that the passenger was giving a true account of what occurred. The record does not reflect

---

[115] *See supra* at part II.D.2.a. *See also supra* at n.68 and surrounding text.

[116] *See supra* at n.110.

[117] *See* TEX. R. EVID. 801(d) (part of the definition of hearsay is that the statement is offered "to prove the truth of the matter asserted in the statement").

[118] *See Langham v. State*, 305 S.W.3d 568, 577 n.26 (Tex. Crim. App. 2010) (citing *Tennessee v. Street*, 471 U.S. 409 (1985)). *Langham* suggested that there was no constitutional problem at all if the relevance of the statement derives "solely" from the fact that it was made, *id.* at 576, but as we explain below, it would follow that, for a statement relevant for both hearsay and nonhearsay purposes (that is, both for what it contains and for the fact that it was made), a proper limiting instruction could obviate the constitutional concerns associated with the impermissible hearsay purpose. *See infra* at n.120 and accompanying text.

whether the rangers even talked to the co-defendant, let alone what he told them if they did. It is not an unheard-of tactic for law enforcement to dissemble about what a suspected accomplice has told them as a ruse to elicit incriminating statements from the accused.[119] And the passage at issue here does not even recite what the passenger allegedly said happened. At worst, Ranger Vela conveyed, in a vague way, that the passenger gave a different story than Appellant.

A limiting instruction could have properly limited the jury's consideration of this passage to the permissible purpose for which it was relevant. Under Rule 105, a party claiming error in admitting evidence "that is admissible . . . for a purpose . . . but not . . . for another purpose" has preserved the claim only if the party had requested the trial court "to restrict the evidence to its proper scope and instruct the jury accordingly."[120] The jury could have been instructed that any alleged statements by the passenger were not admitted for the truth of those statements but to show the context in which Appellant's statements were made and for the purpose of assessing the voluntariness of Appellant's statements. Because the passage was relevant for non-hearsay purposes and Appellant did not request a limiting instruction to restrict the evidence to the non-hearsay purposes, he failed to preserve error as to the possible hearsay effects of the evidence. Point of error twenty is overruled.

### F. Jury Instructions

---

[119] *See Oursbourn*, 259 S.W.2d at 182 ("Although appellant notes that Investigator Guidry lied to him about some witnesses having identified him in the photo spread, it is well established that lying about the state of the evidence is not the sort of 'overreaching' that implicates the Due Process Clause, as long as the subterfuge used is not one likely to produce an untrue statement."); *Green v. State*, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996) ("[A] misrepresentation relating to an accused's connection to the crime is the least likely to render a confession involuntary.").

[120] TEX. R. EVID. 105(b)(1).

In points of error twenty-one and twenty-two, Appellant contends that the jury charge was erroneous when it instructed the jury to first find the defendant not guilty of capital murder before considering lesser-included offenses. He contends that this violated his rights under the Eighth Amendment and as articulated by this Court in *Barrios v. State.*[121]

**1. The Jury Charge and the Charge Conference**

With respect to the offense of capital murder, the jury charge stated:

> [I]f you believe from the evidence beyond a reasonable doubt that the defendant, GUSTAVO TIJERINA SANDOVAL, on or about August 3, 2014, in Willacy County, Texas, intentionally caused the death of JAVIER VEGA, JR. by shooting JAVIER VEGA, JR. with a firearm, in the course of committing or attempting to commit robbery of JAVIER. VEGA, JR., then you will find the defendant guilty of the offense of Capital Murder, as alleged in Count I of the indictment, and so say by your verdict.
> But if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of Capital Murder as alleged in Count I of the indictment, say by your verdict "Not Guilty," and proceed to consider whether the defendant is guilty of the lesser included offense of murder.

The verdict form for capital murder had two signature lines: the first line for not guilty of capital murder and the second line for guilty of capital murder. Below the second signature line was the following passage: "Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of Capital Murder and next consider whether the defendant is guilty of the lesser offense of murder."[122]

Jury instructions that tell the jury when and how to proceed from deliberating about a greater offense to deliberating about a lesser-included offense are sometimes called "transitional

---

[121]   283 S.W.3d 348 (Tex. Crim. App. 2009).

[122]  The jury charge and verdict forms included parallel instructions for the offense of murder vis-a-vis the lesser-included offense of manslaughter.

instructions."[123]  The type of transitional instruction that the trial court gave in this case is often

referred to as an "acquittal first" instruction, because it requires the jury to acquit the defendant of

the greater offense before deliberating on the lesser-included offense.[124]

Appellant's defense attorneys submitted their own proposed jury charge.  It had a different

type of transitional instruction:

> If you all agree the state has proved, beyond a reasonable doubt, both of the two elements listed above [for capital murder], you must find the defendant "guilty" of capital murder and so indicate on the attached verdict form, titled "Verdict-Guilty of Capital Murder."  If you all agree that state has failed to prove, beyond a reasonable doubt, one or both of the elements 1 and 2 listed above, you must find the defendant "not guilty" of capital murder. If you find the defendant is not guilty of capital murder, *or if after all reasonable efforts to do so you are not able to reach a unanimous verdict on the charged offense of capital murder, you should next address whether the stated have proved to lesser included of murder* [sic].[125]

This type of transitional instruction is often referred to as an "unable to agree" or "reasonable effort"

instruction.[126]  After the instructions on the various lesser-included offenses, Appellant's proposed

jury charge contained a "benefit of the doubt" instruction that was not included in the charge

submitted to the jury:

> If you believe from the evidence, beyond a reasonable [sic], that the defendant is guilty of either capital murder or murder, but you have a reasonable doubt about which offenses he is guilty of, you must resolve the doubt in the defendant's favor. In that situation, you must find him guilty of the lesser offense of murder.

At the jury charge conference, the judge confirmed that defense counsel had reviewed the

---

[123]  *State v. Lewis*, 433 P.3d 276, 285 (N.M. 2018).

[124]  *Id.*

[125]  Emphasis added.  Appellant's proposed charge included similar instructions for the lesser offense of manslaughter.

[126]  *Id.*

charge of the court and asked, "Do you have any objections other than that it's not exactly the way yours was written?"   One of the defense attorneys responded, "Judge, *it appears to be correct*, however, there was some other matters that were on my charge that I would have preferred on it."[127] As part of his discussion of what parts of the defense's proposed charge he thought should be included, the defense attorney referred to a part that provided, "[I]f they cannot decide a verdict . . . they could consider the lesser-included offenses."  The defense attorney claimed  that "McClung" prescribed such an instruction.[128] The trial court, apparently looking through "McClung," responded, "I don't see it here, so you find it for me, because maybe I'm looking in the wrong section."  The trial court further asked the defense, "Anything else on the charge other than that?"  Defense counsel responded, "Other than I prefer my charge? . . . No, Your Honor."  The trial court responded, "No? Okay. Then I'll give you a few minutes to look at it."  Later, the parties discussed the fact that the court's jury charge, as drafted, could result in a jury deadlocked on capital murder, would allow for an "*Allen* charge" to encourage the jury to break the deadlock,[129] and could result in a mistrial without the jury addressing the lesser offense of murder.  The State took the position that it was entitled to jury unanimity on either conviction or acquittal of the charged capital murder, with a mistrial if the jury could not agree, while the defense took the position that the jury should be permitted to return a verdict on the lesser offense of murder if the jurors could not agree on the

---

[127]  Emphasis added.

[128]  This appears to be a reference to one of the editions of pattern jury charges by Paul J. McClung and others.  Appellant's brief on appeal does not cite any work from McClung.

[129]  *See Balderas v. State*, 517 S.W.3d 756, 790 n.99 (Tex. Crim. App. 2016) (citing *Allen v. United States*, 164 U.S. 492 (1896) as "permitting a supplemental jury instruction that reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve").

greater offense of capital murder.  The trial court agreed with the State.  After this discussion, the trial court asked the defense attorneys, "Did you find anything?"  The defense attorney who had not been talking responded, "I haven't been able to find it, Your Honor."  The trial court then said that its ruling would stand.

## 2. Constitutional Claim (*Beck*)

Appellant's Eighth Amendment argument is based on *Beck v. Alabama*.[130]  In *Beck*, the jury was instructed solely on capital murder because a statute prohibited an instruction on felony murder even though felony murder was logically a lesser-included offense.[131]  The Supreme Court held that Alabama's preclusion of a lesser-included offense was unacceptable under the circumstances:

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.  Such a risk cannot be tolerated in a case in which the defendant's life is at stake."[132]

This case is not like *Beck*.  Here, lesser-included offense instructions were submitted.  The jury was not faced with having to choose between conviction for capital murder and an outright acquittal of any offense.  It had the third option of conviction for murder (and a fourth option of conviction for manslaughter).  The "acquittal first" instruction for capital murder explicitly informed the jury that murder was an available lesser offense if the jury did acquit of capital murder.  And prior to closing arguments and deliberations, the jury charge was read to the jury in its entirety, so

---

[130]  447 U.S. 625 (1980).

[131]  *Id.* at 628-30.

[132]  *Id.* at 637.

in deliberating on whether Appellant was guilty of capital murder, the jury knew not only that there was a lesser-included offense of murder, but it knew exactly what the elements of that lesser-included offense were.

Citing several out-of-state cases, Appellant contends that the "acquittal first" instruction put him in the same position as the defendant in *Beck.* Those cases are not binding on us, but in any event they do not support his position. He cites *State v. Mays* for the proposition that "the concerns that underlay the Supreme Court's decision in *Beck* have the same 'force when a jury is instructed in how it should proceed in considering the offenses charged.'"[133] But *Mays* did not say that the concerns underlying *Beck* have the "same" force in an "acquit first" instruction situation; it said that the concerns "still have force."[134] *Mays* also recognized that the appropriateness of an "acquittal first" instruction has been debated across the country, with some jurisdictions requiring such an instruction.[135] Appellant also cites *State v. Thomas*[136] and *State v. Allen*,[137] but while both cases said that an "acquittal first" instruction poses the potential for a coerced verdict, neither claimed that such an instruction runs afoul of *Beck.*[138] Appellant points to a quote in *Mays* from *State v. Leblanc*,[139] but *Leblanc* acknowledged that its rejection of an "acquittal first" instruction was a "court-created

[133] *See* Appellant's brief at 179, quoting from *Mays*, 582 S.E.2d 360, 366 (N.C. App. 2003).

[134] *Mays*, *supra*.

[135] *Id.* at 367.

[136] 533 N.E.2d 286 (Ohio 1988).

[137] 717 P.2d 1178 (Or. 1986).

[138] *See Thomas*, 533 N.E.2d at 292 and *passim*; *Allen*, 717 P.2d at 1181 and *passim*.

[139] 924 P.2d 441 (Ariz. 1996).

procedure, not an interpretation of constitutional text, statutory provision, or substantive common law principle,"[140] and it made its new procedure prospective only, affirming the conviction of the defendant before it under an "acquit first" instruction.[141]

And the Oregon legislature has since passed a law requiring an "acquittal first" instruction, superseding the Oregon Supreme Court's holding in *Allen*.[142] When confronted with whether the new Oregon law violated *Beck*, the Oregon Supreme Court held that it did not:

> Contrary to defendant's position, however, there is a difference—one of constitutional significance—between the statute that *Beck* invalidated and the Oregon statute that defendant challenges here.
>
> * * *
>
> The Alabama statute at issue in *Beck* precluded the jury from considering the lesser-included offense of felony murder. The issue did not involve the order of deliberations and when a jury could consider the lesser offense instead of the charged offense; rather, the jury could not consider the lesser offense *at all*.[143]

New Mexico's Supreme Court has observed that a number of jurisdictions require an "acquittal first" instruction and that there are at least four distinct positions in the various jurisdictions regarding what type of transitional instruction should be given.[144] Appellant does not cite, nor are we aware of, any case holding that an "acquittal first" instruction runs afoul of *Beck* or the United States Constitution. We conclude that it does not. Point of error twenty-one is overruled.

### 3. Non-Constitutional Claim (*Barrios*)

Appellant complains that the jury charge contravened our holding in *Barrios* when it required

---

[140] *Id.* at 443.

[141] *Id.* at 444.

[142] *See State v. Turnidge*, 374 P.3d 853, 930 (Ore. 2016).

[143] *Id.* at 931-32 (citation omitted, emphasis in original).

[144] *Lewis*, 433 P.3d at 285.

the jury to reach a unanimous verdict of not guilty of the greater offense before it was permitted to discuss Appellant's potential culpability for a lesser-included offense. He contends that this prevented the jury from having a free discussion and interchange of opinions critical to rendering a proper verdict. He complains that, unlike in *Barrios*, which included a benefit-of-the-doubt instruction, "the trial court gave no instructions similar to the instruction in *Barrios* that the jury could have interpreted to permit it to consider one of the charged lesser-included offenses before reaching a verdict on the greater offense."

### a. Texas Statute and Caselaw

Article 37.08 provides:

> In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense.[145]

We construe a statute by the plain meaning of its text unless the text is ambiguous or the plain meaning leads to results that the legislature could not have possibly intended.[146] We agree with an observation by the First Court of Appeals that the statutory wording of Article 37.08 necessarily means that "a unanimous finding of guilt on a lesser-included offense necessarily requires a unanimous acquittal on the higher offense."[147] The legislature contemplated that a conviction on a lesser-included offense would necessarily be a verdict of acquittal on the greater offense, not simply a situation where the jury could not agree on the greater offense.

---

[145] Art. 37.08.

[146] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[147] *Harris v. State*, 287 S.W.3d 785, 790-91 (Tex. App.—Houston [1st Dist.] 2009, no pet).

In *Boyett v. State*, this Court explicitly approved the use of an "acquittal first" instruction.[148] The Court agreed with Boyett that the transitional instruction in a jury charge should "explicitly instruct[] the jurors that if they did not believe, or if they had reasonable doubt of appellant's guilt of the greater offense, they should acquit appellant and proceed to consider whether appellant was guilty of the lesser included offense."[149] The transitional instruction did not quite conform to the approved instruction, saying, "Unless you so find, or if you have a reasonable doubt thereof, you should consider whether or not the defendant is guilty of the lesser included offense."[150] The Court held that the instruction was not a model charge because it did not use the word "acquit" but that it essentially instructed the jurors to acquit, so the defendant (having not objected at trial) was not harmed under the standard for fundamental error.[151]

In *Barrios*, the transitional instruction mostly conformed to the language suggested in *Boyett,* using the word "acquit":

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and next consider whether the defendant is guilty of robbery.[152]

The jury charge in that case also included a "benefit of the doubt instruction":

> If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either capital murder on the one hand or robbery on the other hand, but you have a reasonable doubt as to which of said offenses he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense

---

[148] 692 S.W.2d 512, 516 (Tex. Crim. App. 1985).

[149] *Id*.

[150] *Id.* at 515.

[151] *Id.* at 516.

[152] 283 S.W.3d at 349.

of robbery.[153]

The defendant in *Barrios* contended that the "acquittal first" instruction conflicted with the "benefit of the doubt" instruction, but the Court disagreed, saying that the defendant's conclusion was based on a narrow interpretation of the jury charge.[154] The Court explained that unanimous verdicts are final decisions and that juries make many decisions in the jury room that are not announced to the court.[155]

*Barrios* also noted that the instruction sanctioned in *Boyett* "has been in regular use in Texas for many decades, going back as far as *Childress v. State*," decided in 1909.[156] Nevertheless, *Barrios* said that the use of the word "acquit" was "inartful" and "at odds with the context of the instruction," which was intended to guide jury deliberations.[157] The Court suggested that it might be a better practice to substitute for "you will acquit . . . and next consider" the phrase "or if you are unable to agree, you will next consider" the lesser offense.[158] The Court suggested that it might be the better practice for a transitional instruction to be the "unable to agree" type rather than the "acquit first" type, but it declined to say that an "acquit first" instruction was erroneous, at least as long as a "benefit of the doubt" instruction was also included.

*Barrios* found no error in the instruction given, and said merely that an "unable to agree"

---

[153] *Id.* at 349-50.

[154] *Id.* at 352.

[155] *Id.*

[156] *Barrios*, 283 S.W.3d at 351 n.1 (citing *Childress v. State*, 55 Tex. Crim. 186, 115 S.W. 582 (Tex. Crim. App. 1909)).

[157] *Id.* at 353.

[158] *Id.*

approach "may" be a better practice instead of requiring that approach. As such, the statement about what might be the better practice was *dictum*.

### b. Approaches to Transitional Instructions

As we explained earlier in connection with Appellant's *Beck* claim, the New Mexico Supreme Court has suggested that there are at least four approaches to transitional instructions. They are: (1) requiring an "acquittal first" instruction, (2) requiring a "modified acquittal first" instruction, allowing a jury to deliberate in the order it sees fit but requiring that it acquit the defendant of the greater offense before returning a verdict on the lesser offense, (3) requiring an "unable to agree" (or "reasonable effort") instruction, and (4) an "optional approach" that allows the defendant to choose between an "acquittal first" instruction and an "unable to agree" instruction.[159]

As we discussed earlier, the plain language of Article 37.08 bars an "unable to agree" instruction—precluding the "unable to agree" and "optional" approaches. And given the fact that numerous other jurisdictions reject those two approaches, we find nothing absurd about following the statutory language.

Even if the language of Article 37.08 could somehow be construed as ambiguous in that regard, other factors would still require a rejection of those two approaches. *Boyett* and the longstanding Texas common law preceding it support the "acquittal first" approach. In Texas, our statute specifically provides that conviction on a lesser-included offense constitutes an acquittal of the greater offense (absent a jurisdictional defect).[160] This statute further reinforces the conclusion that in Texas, a jury must be required to agree on an acquittal of the greater offense before it can

---

[159] *Lewis*, 433 P.3d at 285.

[160] Art. 37.14.

return a conviction on a lesser-included offense.

Article 37.08 does not clearly dictate whether to adopt the "acquittal first" or "modified acquittal first" approach. The statute contemplates that a jury's conviction of the lesser offense will also be an acquittal of the greater offense but it says nothing about how deliberations must proceed.

Given our discussion, we now disavow the suggestion in *Barrios* that a transitional instruction can or should be framed as an "unable to agree" instruction. We consequently reject the "unable to agree/reasonable effort" and "optional" approaches to transitional instructions. We will assume, without deciding, that the jury charge should have included an explicit "modified acquittal first" instruction and a "benefit of the doubt" instruction.

### c. Harm

The next question is harm. If error in the jury charge is not preserved, it is reviewed only for "egregious harm."[161] If the error is preserved, then it is reviewed for "some harm."[162]

Regardless of the standard of harm employed,[163] any error was harmless. Under the jury

---

[161] *French v. State*, 563 S.W.3d 228, 229-30 (Tex. Crim. App. 2018) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

[162] *Id.*

[163] Arguably, Appellant failed to preserve error. Although the "benefit of the doubt" instruction was in the defense's proposed jury charge, defense counsel said the court's jury charge was correct except for matters the defense wanted to discuss, and defense counsel did not discuss the absence of a "benefit of the doubt" instruction from the court's charge. And although the defense did discuss the absence of its proposed "unable to agree" instruction, the defense's contention that the instruction could be found in McClung's collection of pattern jury instructions was arguably not a legal basis for submitting the instruction, and in any event, when asked, defense counsel could not find his proposed instruction in McClung's. We have indicated that a defendant must specify a sufficient legal reason for a requested jury instruction for the claim to be preserved. *Mays v. State*, 318 S.W.3d 368, 384 & n. 52 (Tex. Crim. App. 2010) (citing *Wilson v. State*, 80 Tex. Crim. 266, 189 S.W. 1071, 1072 (Tex. Crim. App. 1916)). *See also French v. State*, 563 S.W.3d 328, 234 & n.5 (Tex. Crim. App. 2018) (to preserve error in jury charge, party must "clearly identify why it was

instructions, the only difference between the charged capital murder and the lesser-included offense of murder was that a robbery or attempted robbery is required for capital murder but not for murder.[164] Although it is theoretically possible for a lesser-included offense of murder to differ from the pled theory of capital murder in other ways,[165] Appellant has not contended that the jury instructions were in error for failing to include these other possible differences, so we will assume that the instructions were correct in that regard.[166]

As is standard in Texas, the guilt-stage jury charge was read in its entirety before closing arguments and jury deliberations. Before deliberations began, the jury was well aware that the lesser offense of murder did not require it to believe that Appellant committed a robbery or attempted robbery. A robbery or attempted robbery was an explicit element of capital murder, so the transitional instruction effectively required the jury to acquit of capital murder, and consider the lesser offense of murder, if it had a reasonable doubt about that one element, which was the sole element that distinguished the two offenses. We see no practical difference between what these

---

objectionable") (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

[164] *Compare* TEX. PENAL CODE § 19.03(a)(2) *with id.* § 19.02(b). The sole culpable mental state as to death for both capital murder and murder in the jury charge was "intentionally."

[165] *See id.* § 19.02(b)(1) ( "knowingly"), (2) ("intends to cause serious bodily injury"), (3) (felony murder).

[166] In a given case, a defendant might forfeit reliance on a theory of murder not encompassed by his request for the lesser-included offense. *See Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010) (jury instruction on lesser-included offense not "applicable to the case" absent a defense request for inclusion in the jury charge). Or the evidence might not raise other legal theories of murder. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (citing *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)) (defendant entitled to submission of lesser-included offense only if raised by the evidence); *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993) (lesser-included offense raised by the evidence only if a jury could rationally find the defendant guilty only of the lesser offense).

instructions required of the jury and what a "modified acquittal first" and Appellant's proposed "benefit of the doubt" instruction would have required. At least in this case, the "acquittal first" instructions required the jury to deliberate, as part of deciding guilt for capital murder, on the one element that distinguished capital murder from murder, while knowing it was the distinguishing element between those two offenses, and knowing that a reasonable doubt on that element required an acquittal of capital murder. Point of error twenty-two is overruled.

### III. PUNISHMENT

### A. Jury Selection

In points of error fifteen and seventeen, Appellant contends that the trial court erred in granting the State's challenges for cause against prospective jurors Garza and Tamayo respectively. He contends that these jurors were improperly removed on the basis of their scruples about the death penalty in violation of *Wainwright v. Witt*.[167] In point of error eighteen, he contends that the trial court improperly denied him the right to examine Tamayo. In point of error sixteen, Appellant contends that the trial court erred in denying his challenge for cause against Prospective Juror Ramirez. He contends that Ramirez was unable to consider life without parole for specific capital murder offenses, including murder in the course of a robbery, and thus was an automatic vote for death in violation of *Morgan v. Illinois*.[168]

### 1. Jury-Selection Law

Under *Witt*, a prospective juror who has conscientious scruples about the death penalty is challengeable for cause only if his views "would prevent or substantially impair the performance of

---

[167] 469 U.S. 412 (1985).

[168] 504 U.S. 719 (1992).

his duties as a juror in accordance with his instructions and his oath."[169] We review a trial court's ruling on this issue with considerable deference "because the trial court is in the best position to evaluate a prospective juror's demeanor and responses."[170] We accord particular deference to a trial court's decision if the prospective jurors answers "are vacillating, unclear, or contradictory."[171] *Morgan* is the flip side of *Witt*: A juror is challengeable for cause if his views in favor of the death penalty would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.[172]

## 2. Prospective Juror Garza

At the beginning of her voir dire, Garza stated that there was no reason she could not serve as a fair and impartial juror but added, "it's a lot to have a person's life in your hands. I mean, that's a big deal." When asked if being fair and impartial sounded like something she "might want to do," Garza responded, "Again, I mean, it's a lot of pressure to have somebody's life in your hands." The prosecutor referred the prospective juror to her answers on a questionnaire, where she answered "no" to the question, "Are you in favor of the death penalty?" Garza acknowledged that she went on to say, "The guilty party should not be able to live with our society. However, killing the guilty party

---

[169] *Hernandez v. State*, 390 S.W.3d 310, 317 (Tex. Crim. App. 2012) (quoting *Witt*, 469 U.S. at 433).

[170] *Id.*

[171] *Id.*

[172] *Colburn v. State*, 966 S.W.2d 511, 518 (Tex. Crim. App. 1998) ("We upheld the trial court's decision to sustain the challenge for cause, pointing to *Morgan v. Illinois*, where the Supreme Court said that jurors, 'whether they be unalterably in favor of or opposed to the death penalty in every case—by definition are ones who cannot perform their duties in accordance with the law, their protestations notwithstanding.'") (citation omitted).

because they killed is an easy way to pay for a debt." She affirmed that she still felt that way. Garza went on to say that she thought a life sentence was a harsher penalty than the death penalty because the convicted person would have to think about what he did.

The questionnaire offered several options regarding views about the death penalty and criminal trials. The option chosen by Garza said, "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." When asked if that option was the most accurate description, she responded, "I mean, I would think so. I think I'm pretty open-minded. I mean, it's not—you know, I know that this is a capital murder case. I know that what he's being accused of is, like you said, immoral. And so I understand where the State is coming from. I mean, I get that point. I understand."

The prosecutor asked Garza under what set of circumstances could she assess the death penalty. Garza responded, "[J]ust based on the evidence . . . the facts are the facts and whatever happened happened." She also said she would want information that would make it so "maybe I would feel that the death penalty was okay. I just feel that you need to make it okay for me. I want to know that the punishment fits the crime."

The prosecutor asked Garza if it was fair to say that deciding on the death penalty was "something that you would not want to do." She answered, "Pretty much. I mean, like I said, it's a big—it will weigh heavy on my conscience, I think, you know." The prosecutor asked, "[I]s it a big enough deal that you would not be able to assess the death penalty in a case even if it's one of these types of cases" for which the capital-murder statute says the death penalty is an available punishment. Garza responded, "Again, I don't—I would need to hear your side, I guess. *I don't know.* I don't know how to explain it, other than I would need to see what it is that you are wanting

to justify, I suppose."[173]  The prosecutor then said, "We kind of need to know now whether or not you can do it.  And if you are—it's too late for us to find out after you have taken the oath that you're going to do it and then you realize to yourself, "You know what?  I thought I could.  I really want to be able to do my job, but I can't."  Garza responded, "*And I think that's where I'm at.*  I mean, I want to do my civil duty.  And that's where I'm kind of conflicted, is that I want to do my civil duty. *But I don't think I could do that.*  That would be hard."  Later the prosecutor pointed out jurors were needed who could impose the death penalty and asked, "Now, is that something you can do?"  Garza responded, "*I don't think, no not to take somebody's life.  I don't think I could.*"

When asked by defense counsel, "You could not render a verdict because it's a capital murder case?" Garza responded, "No I could.  I didn't say I couldn't.  I just don't know that I could take his life."  When asked whether she would automatically grant a life sentence over a death sentence, she responded, "I just don't think that I could—if I'm just answering the questions yes or no, and the judge is making the decision whether its going to be a death penalty or life in prison, if I'm just answering yes or no to those questions, of course, I can do that."  After a lengthy discussion by defense counsel, when asked if she could listen to the evidence and decide the case based on the evidence and based on the instructions given by the trial court, Garza responded, "Yes."

The trial court then explained to Garza that she would be asked two questions but that she would know the effect of the answer to those two questions, and that if those questions were answered a certain way, the trial court would impose the death penalty.  The trial court asked, "Could you do that?"  Garza responded, "I—I don't think so.  Not in that—you know, he made it sound a little different, but—."  The trial court then asked Garza to step outside the courtroom.  The State

---

[173]  All emphasis in voir dire testimony has been added.

challenged Garza for cause, and the trial court granted the challenge.

The trial court was within its discretion to grant the challenge for cause. At best, Garza was a vacillating juror with respect to whether her views about the death penalty would substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. In fact, though not required to uphold the trial court's challenge for cause, the record in this case clearly favors the conclusion that she could not in fact perform her duties because of her death-penalty views. Point of error fifteen is overruled.

### 3. Prospective Juror Tamayo

During its general instructions to the special venire on which Tamayo sat, the trial court explained that a jury would not be asked to deliver a verdict on life or death. Rather, a jury would decide "special issues, questions that are asked of them." The trial court said the jurors "don't answer . . . those questions because they want somebody to get the death penalty or because they don't want somebody to get the death penalty. They answer the questions because they believe the evidence proves to them that the question should be answered in a certain way." The trial court further explained:

> Under the law, a juror, to be fair, must say, "I'm going to listen to the evidence, and I'm going to answer the questions honestly as I believe was proved under whatever burden the Court gives me, if any. And I'm going to answer them based upon the facts of the case and the law in this case, not on a predisposition that I like or not like the death penalty. And whatever the answers are, the answers are."

The trial court explained that the jurors would know the effect of their answers but are nevertheless required to answer the questions based on the evidence and not to require a certain verdict.

The trial court then discussed three statutory special issues that could arise in Appellant's

case: the future dangerousness issue, the anti-parties issue, and the mitigation issue.[174] The trial court quoted these special issues and explained them in some detail. The trial court explained that the State had the burden of proof beyond a reasonable doubt on the first two special issues and that no one had a burden of proof on the mitigation special issue.

After explaining the special issues, the trial court then asked the venire members to raise their card numbers if their beliefs prevented them from following the law:

> [I]s there anyone present that says, "Judge, as a juror, because of my position with respect to—respect to a philosophy about the death penalty, I could not serve as a juror in that case, and I could not and would not fairly answer the questions as was proven to me by the evidence in a way that would result in assessing the death penalty. I would violate my oath as a juror. I would answer them a different way just to make sure that the death penalty was not assessed. Even if the State proved the answers should be answered in a certain way, I'd answer them a different way to make sure that a life sentence was imposed as opposed to the death penalty"? If you feel that way, please raise your card in number.

The judge then listed off the card numbers of the jurors that raised their hands, the first of which was number 5. The master index of the court reporter's record has Tamayo listed as the fifth juror questioned in individual voir dire.

During her individual voir dire, the trial court asked Tamayo if it was correct that she had stated on a written jury questionnaire that she could "never under any circumstances return a verdict which assessed the death penalty." Tamayo responded that that was correct. The trial court asked the prospective juror, "So you're strongly opposed to it?" Tamayo responded, "Strongly opposed to the death penalty, yes." The trial court then asked, "And it doesn't matter what I tell you or what you hear, you could not assess it?" Tamayo answered, "I cannot." At that point, the trial court indicated that it would excuse the prospective juror. Defense counsel responded that he might be

---

[174] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1), (2), (e)(1).

able to rehabilitate the juror. The trial court further asked Tamayo if her opposition to the death penalty was due to religious beliefs, and she responded, "It is because of my religious beliefs. Uh-huh. I don't think I can play God and do that to someone." The trial court again indicated that it would excuse her. Defense counsel objected and said that he could ask questions to rehabilitate the prospective juror, but the trial court excused Tamayo without permitting questioning by either of the parties.

The record supports the trial court's decision to excuse Tamayo. The Texas system of special issues was explained to her during the trial court's general instructions to the venire. Moreover, the record supports the conclusion that she raised her card number when asked who among the venire would not follow the law and answer the special issues fairly because of the person's views against the death penalty. Whether or not she raised her card number during general voir dire, however, she indicated in individual voir dire that she would never under any circumstances be able to assess the death penalty. Point of error seventeen is overruled.

Appellant, however, also claims that the trial court erred in refusing to allow his attorney to question the juror. The State concedes that the trial court erred in this regard but, relying upon *Simpson v. State*,[175] contends that the error was harmless.

In *Simpson*, we held that Article 35.17 requires the trial court, upon demand of either party, to permit that party to individually question the prospective juror on principles already discussed by the trial court.[176] But we held that such error was subject to a harm analysis and was harmless under

---

[175] 119 S.W.3d 262 (Tex. Crim. App. 2003).

[176] *Id.* at 266. *See also* Art. 35.17, § 2 (". . . on demand of the State or defendant, either is entitled to examine each juror on voir dire individually . . . and may further question the juror on the principles propounded by the court.").

the facts of that case.[177] We said that the trial court explained the special issues to the venire member and that she at first said she could answer the special issues according to the evidence even if it meant imposing a death sentence.[178] But when questioned about her answers to a written questionnaire, the prospective juror ultimately said that she was against the death penalty and that her personal feelings would override any evidence that was presented at trial and prevent her from returning a verdict of death.[179] She also explained that she held religious beliefs against the death penalty.[180] We held that it was highly unlikely that the defendant would have been able to convince the juror to say otherwise or that the trial court would have abused its discretion in dismissing her for cause.[181] We held that the error was harmless.[182]

Appellant contends that *Simpson* is distinguishable because Tamayo was not specifically questioned about whether she could consider the evidence and apply it to the law to answer the special issues. But the trial court did conduct such questioning during general voir dire, and the record supports a conclusion that Tamayo raised her card number to affirmatively indicate that she could not follow the law. And regardless of whether she raised her card number, the special issues had been explained to her, and she definitively stated that she would never under any circumstances return a verdict that assessed the death penalty. Unlike the prospective juror in *Simpson*, Tamayo

---

[177] *Simpson*, *supra* at 266-267.

[178] *Id.*

[179] *Id.* at 267.

[180] *Id.*

[181] *Id.*

[182] *Id.*

did not vacillate at all, and she indicated that she could not impose the death penalty regardless of the evidence at trial or the trial court's instructions. As was the case in *Simpson*, Tamayo indicated that her opposition to the death penalty was based on religious beliefs. And the trial court here clearly indicated multiple times that it would excuse Tamayo regardless of what else she might say, presumably because her initial answers would at most render her a vacillating juror. Because the trial court would have been justified in excusing Tamayo as a vacillating juror, the error was harmless. Point of error eighteen is overruled.

### 4. Prospective Juror Ramirez

When questioned by the prosecutor, Ramirez acknowledged that he was in favor of the death penalty. When asked if he could return a verdict of life without parole if the facts say that punishment is appropriate or a verdict of death if the evidence indicated that was appropriate, he responded, "Yes, sir." He agreed that the death penalty was not automatic.

When questioned by the defense, Ramirez said that he was strongly in favor of the death penalty. Defense counsel asked Ramirez a number of questions about whether certain types of capital murders would be the kind of cases in which he could consider life without parole. These included murder in the course of committing or attempting to commit robbery. Ramirez answered all of these questions, "No, sir." He also said that laws on criminal punishments treated defendants too leniently.

After the defense questioning, the trial court referred Ramirez back to his answers to the kinds of cases for which Ramirez believed life without parole would not be an appropriate penalty. Shortly after that, referring to the punishments of the death penalty and life without parole, the trial court asked, "After you hear all the evidence and you're with your fellow jurors, would you consider

both ranges of punishment, or would you only want the death penalty?" Ramirez responded, "I will consider both." The trial court then asked the prospective juror if, even with his personal feelings, he would, throughout the whole trial, have an open mind as to either punishment. Ramirez said that was correct.

The defense resumed questioning and, after pointing out that capital murder trials can be emotional with distraught family members, asked whether Ramirez could give a life sentence if he saw evidence that was sufficient to be mitigating. Ramirez responded, "Yes." When defense counsel asked how that answer could be consistent with his earlier responses to defense counsel, Ramirez responded that he understood the question after the judge explained it to him. Defense counsel responded that Ramirez seemed to have changed his answer 180 degrees and asked, "So which one should I believe?" Ramirez responded, "The last answer that I gave."

Defense counsel challenged Ramirez for cause. The trial court denied the challenge for cause, and Ramirez ultimately sat on the jury.

We conclude that Ramirez was a vacillating juror and that there was sufficient support in the record for the conclusion that he would keep an open mind on the punishment of life without parole in a capital murder case. Point of error sixteen is overruled.

### B. Evidence

### 1. Ineffective Assistance of Counsel – Opinion about Appropriate Punishment

In point of error twenty-five, Appellant contends that counsel was ineffective for failing to object to improper victim-impact testimony. Specifically, he complains about an opinion elicited from the victim's father regarding the appropriate punishment for killing his son. Appellant argues that a family member's opinion as to the appropriate sentence is inadmissible in a death-penalty case

under *Booth v. Maryland* and subsequent Supreme Court cases.[183] He claims that there is "no conceivable sound trial strategy" for defense counsel's failure to object because it was apparent from the State's questioning that it was attempting to elicit testimony that violated *Booth* and because this type of testimony is inherently inflammatory.

### a. The Testimony, Closing Arguments, and Jury Notes

Appellant complains about the following exchange with the victim's father during the punishment phase:

Q. What kind of justice do you want or do you think this jury should give you?

A. I think they should give me, to be honest, dude, an eye for an eye. That's what I want. And not because of me but because of my baby.

Q. What were the last words that Harvey ever said to you?

A. "He got me, Dad. Get him." That's what he told me.

Defense counsel did not object to this testimony.

In closing argument at punishment, defense counsel discussed Harvey's father's "eye for an eye" testimony and referred to Jesus's "turn the other cheek" sermon in the Bible:

Mr. Vega, Sr., took the stand and he was asked what he wanted. He said an eye for an eye. But, you know, if you read that passage in the Bible, Jesus said to not succumb to an eye for an eye and a tooth for a tooth, to ignore that evil or set aside that evil and, in fact, turn the other cheek. That's what – that's what that whole passage says. So eye for an eye is not justice. An eye for an eye is vengeance. I understand Mr. Vega's desire for vengeance. I understand. He has every right. But that's not what the law is. The law is based on what the evidence is.

In its rebuttal closing argument, one of the prosecutors responded:

---

[183] He cites *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016); *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991); and *Booth v. Maryland*, 482 U.S. 496, 509 (1987), *overruled on other grounds by Payne v. Tennessee*.

[Defense counsel] came up here and told you that Jesus said to turn the other cheek. I normally don't get into religious verses in closing argument, but I will tell you this. The Bible also says in Proverbs 21:15, "When justice is done, it is a joy to the righteous but it is a terror to evildoers." Punishment is justice for the unjust. The first duty of any society is justice, ladies and gentlemen. You, basically, have to do three things now. You have to answer two special issues and you have to decide the punishment for the attempted capital murder case.

During punishment deliberations, the jury sent out two notes that Appellant claims are relevant. The first of these notes asked: "May we meet with Mr. & Mrs. Vega to offer our condolences after we the jury sentence Gustavo Tijerina Sandoval?"[184] The second asked if two life sentences would run concurrently or consecutively.[185]

### b. Deficient Performance Not Shown

For a defendant to prevail on a claim of ineffective assistance of counsel, the record must show that counsel's performance was deficient and that the defendant was prejudiced.[186] Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped.[187] Ordinarily, trial counsel should be afforded an opportunity to explain his conduct before being denounced as ineffective.[188] Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent

---

[184] The trial court responded that it was "not the time to respond to this question."

[185] The trial court responded that the question was a legal issue that the trial court would decide.

[186] *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

[187] *Id.*

[188] *Id.*

attorney would have engaged in it."[189]

Trial counsel has not been given an opportunity to respond to Appellant's claim. Appellant has argued that there is no conceivable sound trial strategy, but we disagree. Counsel could have reasonably believed that the victim's father being in favor of a death sentence would be no surprise to the jury and decided that objecting would emphasize the issue. Counsel might have thought that the "eye for an eye" statement was a good springboard for a Biblical plea for mercy. In closing argument counsel responded to the "eye for an eye" statement by referring to Jesus's statement to "turn the other cheek." There may be other reasons. We do not know why counsel did not object, and this is not a situation where the failure to object would necessarily constitute deficient conduct.

Point of error twenty-five is overruled.

### 2. Extraneous-Offense Victim-Impact Evidence

In points of error twenty-six and twenty-seven, Appellant contends that the trial court erred in admitting extraneous-offense victim-impact testimony. He contends that the admission of this evidence violated the Eighth Amendment and due process. He complains about testimony from four victims of the extraneous robberies about the impact of the incidents on their lives. He complains about the following questions and responses:

Q. How did it make you feel going through that?

A. Mostly, very angry, scared for my family, and happy they didn't do anything to us.

* * *

Q. How has your life changed as a result of this?

A. When that happened, I couldn't sleep for two weeks. I would call the Sheriff's Department for any little noise that I would hear. We would sleep on the floor just

---

[189] *Id.*

thinking that they were out there.

\* \* \*

Q. How did being robbed at gunpoint make you feel?

A. I got anxiety all the time after that. I wasn't scared while it was happening, but after it happened, I was, like, really scared for my friend, especially. And then I got really nervous after that. Just the thought of it is crazy, you know what I mean? I never thought that I would go through that. And it wasn't a good feeling at all.

\*\*\*

Q. What effects, if any, has it had in your lives from that point on?

A. Well, I always remember, and my chest burns out of anger that I wasn't able to do anything.

The record citations provided by Appellant reveal no objection to any of this testimony, and Appellant does not claim in his brief that he preserved error. A party must timely object to preserve error in admitting evidence.[190] This rule applies to victim-impact evidence.[191] Error has not been preserved. Points of error twenty-six and twenty-seven are overruled.[192]

### C. "Without Parole" and "Parole" Jury Instructions

---

[190] TEX. R. EVID. 103(a)(1)(a); TEX. R. APP. P. 33.1(a)(1).

[191] *Mays*, 318 S.W.3d at 391-92.

[192] Appellant acknowledges that our decision in *Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007), is contrary to his position. There, we differentiated between testimony about the effect of a crime on the *victim* and testimony about the secondary effect of the crime on *third persons* (e.g. the effect a victim's death has on his family members). We held that "victim impact" evidence "is evidence of the effect of an offense on people *other* than the victim." *Id.* at 531. In *Roberts*, as here, the victim of an extraneous offense testified about the effect on her of the crime against her. It was not victim-impact testimony because she was the victim of the crime about which she testified, and we indicated that her testimony was admissible. *Id.* Appellant claims that *Roberts* should be overruled, but we have no occasion to address that claim because Appellant failed to preserve error. And although the State did not raise preservation, it is a systemic requirement that a first-level appellate court can (and before reversing must) address, regardless of whether the issue is raised by the parties. *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020).

In points of error one and two, Appellant contends that the trial court failed to clearly instruct the jury on his parole ineligibility. He claims that this failure amounted to a violation of due process and the Eighth Amendment's prohibition against cruel and unusual punishments. He relies upon *Simmons v. South Carolina*.[193] He concedes that he did not raise his complaint at trial.

A plurality of the Supreme Court held in *Simmons* that, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole," the jury must "be informed that the defendant is parole ineligible."[194] Appellant advances four arguments for why he thinks the jury instructions failed to properly inform the jury of his parole ineligibility. First, he contends that the trial court failed to instruct the jury on the meaning of a sentence of life without parole as required by Article 37.071 § 2(e)(2)(B) of the Texas Code of Criminal Procedure. Second, he contends that the jury instructions and the verdict form on the mitigation issue omitted the language "without parole" and instead identified "life" as the alternative sentence to the death penalty. Third, he contends that the trial court affirmatively instructed the jury on his eligibility for parole and good conduct time on his sentence for attempted capital murder. Finally, he points to the general instructions at the end of the jury charge that the jury should not consider the length of time he would be required to serve on his sentence because such matters were the province of the parole board and the Governor. Appellant also points to the jury note asking whether two life sentences would be consecutive or concurrent to show that the jury was confused about what a life without parole sentence meant in a capital murder case.

Part I of the jury charge said: "You are instructed that the punishment for Capital Murder is

---

[193]   512 U.S. 154 (1994) (plurality op.).

[194]   *Id.* at 156.

either death or imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without the possibility of parole." This was a clear statement that the only possible sentences for capital murder were death and life without parole.

The mitigation issue was worded in the punishment jury charge as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

It is true that this statement of the mitigation issue omitted the required words "without parole" after "life imprisonment."[195] But any ambiguity created by the wording of the mitigation issue was clarified by an instruction that immediately followed:

> You are instructed that if a jury answers that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death sentence be imposed, the Court will sentence the defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life *without possibility of parole*.[196]

A later instruction stated that life without parole was the consequence of an answer to either special issue in the defendant's favor:

> If the jury returns a negative finding on either of Special Issues Number 1 or an affirmative finding to Special Issue Number 2, the Court shall sentence the Defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life *without the possibility of parole*.[197]

Appellant is correct that the jury charge omitted an instruction required by Article 37.071, § 2(e)(2)(B). That statute requires that the jury be instructed that "a defendant sentenced to

---

[195] *See* Art. 37.071, § 2(e)(1).

[196] Emphasis added.

[197] Emphasis added.

confinement for life without parole under this article is ineligible for release from the department on parole."[198] Nevertheless, the jury charge included language in three places that the life sentence would be without the possibility of parole, which indicates that TDCJ would not be permitted to release the sentenced individual on parole.

Appellant is also correct that there were instructions on parole law in connection with the attempted-capital-murder charge that indicated eligibility for good time and parole. Appellant contends that these instructions were in error because he was not eligible for parole on the capital murder charge. But he was eligible for parole on the attempted capital murder charge, and statute mandated that the instruction be given for a noncapital offense.[199] If the capital-murder conviction were later overturned (and not reinstated), he would at some point be eligible for release on parole on the attempted-capital-murder conviction.

Appellant is also correct that a noncapital parole-law instruction was mingled with general instructions that applied to both the capital-murder and attempted-capital-murder offenses. The jury charge did not clearly mark when the attempted-capital-murder instructions ended and the general instructions began. Nevertheless, even if the placement of the instruction was somewhat confusing, it did not change the fact that the jury was clearly instructed that, as to the capital-murder charge, a sentence of life was "without the possibility of parole."

This case is not like *Simmons*. In *Simmons*, the jury was not instructed that a life sentence would be without parole.[200] In the case before us, the jury *was* instructed that a life sentence would

---

[198] Art. 37.071, § 2(e)(2)(B).

[199] *See* Art. 37.07, § 4 (2013).

[200] *Simmons*, 512 U.S. at 158-60.

be without the possibility of parole. Appellant claims that *Simmons* was violated because the instructions did not *unambiguously* convey that a life sentence for the capital murder charge would be without parole. We disagree. In multiple places, the instructions explicitly stated that a life sentence for capital murder is without parole.

Even if we thought the instruction contained ambiguity, when the claim is that an instruction is ambiguous and subject to an interpretation that would violate the constitution, the proper inquiry is whether there "is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the constitution.[201] Jury instructions should be reviewed with "commonsense understanding of the instructions in the light of all that has taken place at the trial," and reviewing courts should avoid "technical hairsplitting."[202] We should view the instructions in light of how the jury as a whole likely perceived them rather than how a "single hypothetical 'reasonable' juror could or might have interpreted the instruction."[203]

As we have previously explained, the jury instructions said in three places that a life sentence for capital murder was without the possibility of parole. In addition, every single person who participated as a juror was told in individual voir dire that the only possible punishments for capital murder were the death penalty and life without parole. Also, the TDCJ official who testified at the punishment stage talked about the prison classification of inmates who were sentenced to life without parole. And in closing arguments, defense counsel told the jury that it could sentence

---

[201] *Boyde v. California*, 494 U.S. 370, 380 (1990).

[202] *Id.* at 381.

[203] *Id.* at 380.

Appellant on the capital murder charge "to prison for the rest of his natural life."[204] Given the entirety of the record, we conclude that there is not a reasonable likelihood that the jurors construed the instructions in a manner inconsistent with the *Simmons* requirement that jurors be informed that a life sentence for the capital-murder charge would be without parole.

Appellant contends that the third jury note asking about whether life sentences could be stacked indicated that the jury did not understand that Appellant would never be released from prison if sentenced to life on the capital murder charge. We disagree. Although it might seem odd to stack a life sentence and a life-without-parole sentence, the only authority we are aware of that limits such an occurrence is the statute preventing most offenses from being stacked if they arise from the same criminal episode and are prosecuted in a single criminal action.[205] That would prevent stacking in this case, but it is understandable that the jurors would be unaware of the same-criminal-episode statute. If the sentences could be stacked, doing so would have consequences if a life-without-parole

---

[204] Appellant points out that one of the prosecutors argued that justice demands and the evidence proves that Appellant "should spend the rest of his life paying for" shooting the victim's father and "should receive the death penalty for" the capital murder of the victim. He suggests that the prosecutor's argument muddied the distinction between a life sentence in a noncapital case and a life without parole sentence in a capital case. We disagree. Saying that the defendant should "pay" for the rest of his life is not necessarily the same as saying he will be in prison for the rest of his life. A defendant on parole is still "paying for" his crime because he is under supervision. *See* TEX. GOV'T CODE §§ 508.002 ("Neither parole nor mandatory supervision is a commutation of sentence or any other form of clemency."); 508.142 (c) ("The period of parole is computed by subtracting from the term for which the inmate was sentenced the calendar time served on the sentence."); 508.143(a) ("A releasee while on parole is in the legal custody of the division."); 508.221 ("A parole panel may impose as a condition of parole or mandatory supervision any condition that a court may impose on a defendant placed on community supervision.").

[205] *See* TEX. PENAL CODE §3.03 (concurrent sentencing for offenses arising from same criminal episode that are prosecuted in single criminal action; capital murder and attempted capital murder not among exceptions). *See also* Art. 42.08(a) (trial court discretion to impose a sentence concurrently or consecutively with a prior sentence).

sentence were ever reformed or commuted to something less, such as life with parole. The jurors'
stacking question does not necessarily suggest that the jurors misunderstood the nature of a life
without parole sentence in a capital case. Points of error one and two are overruled.[206]

## D. Closing Argument

In points of error twenty-three and twenty-four, Appellant contends that the prosecutor
impermissibly commented on his silence in violation of the Fifth Amendment.[207] Appellant was
voluntarily absent during the punishment stage of trial. In his punishment-stage closing argument,
one of the prosecutors commented:

> Ladies and gentlemen, the best predictor of future behavior is past behavior. Fact,
> the defendant does not respect the law. Fact, the defendant does not respect human
> life. Fact, the defendant does not respect these proceedings. Fact, the defendant does
> not respect you. *Is he here? Has he been here through these entire proceedings? Has*
> *he sat and faced the punishment trial? Has he looked you in the eyes?* Fact, the
> defendant does not respect authority. Fact, the defendant does not respect your

---

[206] If constitutional error in the jury charge were established, we would need to conduct a harm analysis. The usual standard of harm for unobjected-to jury-charge error is the *Almanza* egregious-harm standard, even when the error is constitutional. *Jimenez v. State*, 32 S.W.3d 233, 237-38 (Tex. Crim. App. 2000). Citing *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993), Appellant contends that he did not forfeit a constitutional harm analysis because the error involves range of punishment, a waivable-only right. But we have suggested that unobjected-to jury-charge error relating to a waivable-only right is still evaluated under the *Almanza* framework, *see Woodard v. State*, 322 S.W.3d 648, 657-58 (Tex. Crim. App. 2010) (applying egregious-harm standard to unobjected-to jury-charge error that violates the grand-jury guarantee), and more specifically, that unobjected-to range-of-punishment errors in the jury instructions are evaluated under the egregious-harm standard. *See Bell v. State*, 635 S.W.3d 641, 646 (Tex. Crim. App. 2021) (error in omitting element of enhancement provision subject to *Almanza* harm framework); *Kucha v. State*, 686 S.W.2d 154, 155 (Tex. Crim. App. 1985) (egregious-harm standard applied to unobjected-to failure of jury charge to include range of punishment in the event an enhancement was found to be untrue). Having found no constitutional violation, we need not address the issue of harm.

[207] He also claims a violation of Article 38.08 of the Code of Criminal Procedure. Because he does not claim that the statute provides different or more expansive protection than the Fifth Amendment, we focus only on the constitutional claim. *See supra* at n.77.

verdict.[208]

Defense counsel objected that the prosecutor was "making comments as to my client not testifying." The prosecutor responded that he was "not speaking about the defendant testifying, Judge. The fact that the defendant is not here, is he's not here." The trial court then responded, "Let's move along." Defense counsel stated, "Well, for the record, Your Honor, he has a legal right not to be here and it's improper to comment as to that." The trial court responded, "That is correct. He has a legal right." Defense counsel then requested a mistrial, and the trial court denied that request.

In determining whether a prosecutor's comment during closing argument was an impermissible comment on the defendant's failure to testify in violation the Fifth Amendment, we must view the prosecutor's argument from the jury's standpoint and resolve any ambiguities in favor of the argument being permissible.[209] A prosecutor's comment is not an impermissible comment on the defendant's failure to testify if the language in the comment could be reasonably construed as merely an implied or indirect allusion to the failure to testify.[210] A prosecutor's comment is considered a comment on the failure to testify only if the language was manifestly intended to be such or was of a character that the jury would necessarily and naturally take it as such.[211]

The prosecutor's comment was not a comment on Appellant's failure to testify. It was a comment on Appellant's absence during the punishment-stage proceedings.[212] A defendant could

---

[208] Emphasis added.

[209] *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011).

[210] *Id.*

[211] *Id.*

[212] *See Resnover v. Pearson*, 965 F.2d 1453, 1465 (7th Cir. 1992) ("Similarly, the prosecutor's comments regarding Resnover's refusal to be present in the courtroom during the

be present and still not testify, or he could testify and be absent part of the time, so a comment on a defendant's absence from the proceedings is not itself a direct comment on the failure to testify.

Points of error twenty-three and twenty-four are overruled.

The judgment of the trial court is affirmed.

Delivered: December 7, 2022

Publish

---

penalty phase of the trial do not amount to error. Indeed, the excerpts are not comments on Resnover's refusal to testify. Instead, they refer to the fact that Resnover and Smith boycotted the penalty phase of the trial. There was no constitutional violation. The prosecutor's statements merely pointed out that the defendants were absent from the courtroom; they did not comment on either defendant's exercise of his privilege against self-incrimination."); *cf. Wead v. State*, 129 S.W.3d 126, 128, 130 (Tex. Crim. App. 2004) (comment on defendant's outward demeanor in the courtroom not a comment on the failure to testify).